Dwayne **COULTER**, Petitioner–Appellee,

v.

Jerry **GILMORE**, Respondent–Appellant.

No. 96–4033.

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1997.

Decided Sept. 17, 1998.

**914**

Christine Renee (argued), Norgle–Loewer, Chicago, IL, for petitioner–appellee.

Darryl B. Simko (argued), Office of the Attorney General, Chicago, IL, for respondent–appellant.

Before ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

On October 17, 1985, Officer Michael Ridges of the Prospect Heights, Illinois, Police Department was killed after he stopped three individuals in a blue Cadillac bearing no license plates. Dwayne Coulter, an African–American, was one of the passengers in the Cadillac. Coulter ultimately stood trial and was convicted in Illinois state court on charges of first degree murder (of Ridges) and of conspiracy to commit murder of one Robert Fischer. See *People v. Coulter*, 230 Ill.App.3d 209, 171 Ill.Dec. 643, 594 N.E.2d 1163 (Ill.App.1992). Although the state left unused four of its fourteen peremptory challenges and ultimately empaneled a jury that included three jurors and two alternates who were African–American, nine of the state's ten exercised peremptories were used to strike potential African–American jurors. Coulter claimed, first before the state courts on direct appeal and then in the court below under 28 U.S.C. § 2254, that the state's use of peremptories violated his rights under the Equal Protection Clause of the U.S. Constitution and thus ran afoul of the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The district court agreed and granted Coulter's petition.

**I**

Officer Ridges crossed paths with Coulter and his two codefendants while investigating an alleged conspiracy by the three men to kill Fischer. Coincidentally, shortly after interviewing Fischer about the plot to kill him, Ridges noticed the Cadillac in which the three men were riding, saw that it lacked license plates, called in a traffic stop, and approached the car. Minutes later, police heard a second call reporting that an officer was shot at the same location; the first offi-

cer on-scene found Ridges dead of a bullet wound to his head. The officer also found the driver's license of one of Coulter's codefendants. Coulter and his two codefendants were later spotted on the Kennedy Expressway and ordered to pull over. A search of Coulter produced a .38 caliber pistol, which later tests revealed to be consistent with the weapon that killed Ridges. Coulter also tested positive for gunpowder residue on his hands. See generally *People v. Coulter*, 594 N.E.2d at 1165–67, 171 Ill.Dec. 643 (discussing the facts in detail).

Coulter was charged with the murder of Ridges and conspiracy to commit the murder of Fischer. He elected to go to trial before a jury. During jury selection, the government used nine peremptory challenges to strike African–American jurors from the jury venire; it also struck one non–African–American juror and left its four remaining challenges unexercised. This pattern prompted Coulter's attorney to move three times for a mistrial on the ground that the government's use of peremptory challenges violated the Equal Protection Clause (as explained in *Batson*). The state trial judge, following a procedure we set forth in more detail below, denied the motions after listening to the government's proffered nondiscriminatory reasons for the challenges. The final jury consisted of eight Caucasians, one Hispanic and three African–Americans. The two alternates were also African–American.

At trial, Coulter admitted to the shooting but claimed that it was an accident that occurred when he slammed the gun on top of the hood of the Cadillac after he became angry while he was talking to Ridges. The jury didn't buy his story; instead, it found him guilty of first degree murder of Ridges and conspiracy to murder Fischer. Because the jury declined to impose the death penalty, Coulter received a sentence of natural life imprisonment. The Illinois courts subsequently denied relief on the claims Coulter raised on direct appeal of his sentence, including the *Batson* claim now before us.

At the start of *voir dire* and before the defendant had even raised a *Batson* challenge, the trial judge indicated that because the State had sought the death penalty, both parties would be required to give contemporaneous, *in camera* explanations on

the record as each peremptory strike was exercised. Ironically, as the Illinois appellate court found on direct appeal, rather than heading off potential problems, the failure to conduct a methodical, step-by-step *Batson* hearing at the end of jury selection impermissibly reduced the *Batson* issue on appeal to "an undifferentiated review of defendant's contentions and the State's rebuttal explanations." *People v. Coulter*, 171 Ill. Dec. 643, 594 N.E.2d at 1171. Thus, before it could even consider the defendant's *Batson* claim, the Illinois appellate court initially had to remand the case "for clarification of the record concerning the jury selection procedure and for any necessary further proceedings...." *Id.* On that limited remand (during which the appellate court retained jurisdiction over the appeal), the trial court allowed counsel to supplement the record on the basis of written briefs. We have now learned, contrary to what we had been told before, that the trial court also heard arguments on three occasions, including Coulter's motion to reconsider. Unfortunately, those transcripts became unavailable at some point during the history of this case. Because we were of the view that a petition for a writ of habeas corpus based on *Batson* should be granted only if the record clearly reflects a problem, we took considerable time to try to procure these transcripts. We now have the transcript of the judge's hearing on March 11, 1991 (which had to be reconstructed for purposes of this appeal from the court reporter's original notes, we understand). To the extent it sheds light on Coulter's appeal, we take that into account here. (The other two transcripts are still unavailable and show no prospect of being reconstructed; we therefore necessarily proceed without them.)

At that March 11, 1991, hearing, the state trial judge began by asking Coulter's lawyer what he wished to add to the record. The lawyer briefly reviewed the facts about the number of African–Americans who were struck by the state and sought permission for discovery of the state's notes about the excused jurors. The state objected on the ground that the prosecutors had already been required to give their "neutral reasons," adding the obscure comment that "I think

counsel supplementing on the record at this time does not add to the record." (This comment is hard to reconcile with the command of the Illinois Appellate Court, described in its 1992 opinion, 171 Ill.Dec. 643, 594 N.E.2d at 1171, but we put that to one side.) In the end, even though the trial judge conceded that there was nothing in the original record that explained what the judge himself was doing at the time, he not only refused to allow Coulter's lawyer to conduct further discovery or otherwise to supplement the record, but he also denied an express request from the lawyer to make an offer of proof and threatened to hold the lawyer in contempt for asking. The result was that the second "hearing" for which the Illinois Appellate Court had remanded the case amounted to nothing more than the judge's reiteration of his belief that his original method of proceeding had been satisfactory. On the basis of the additional written submissions and the earlier record, the trial court again found that Coulter had failed to establish a *prima facie* case of discrimination under *Batson*, and that in any event the state had offered race-neutral reasons for its challenges. 171 Ill.Dec. 643, 594 N.E.2d at 1171.

The second time around, the Illinois Appellate Court had the following observation about the procedure the trial judge had followed at the original trial:

> It appears that the procedure followed was less than ideal, for the record suggests that defendant was unable to attack the reasons offered by the State until the hearing on defendant's motion to reconsider. Moreover, the record indicates that the trial court exhibited an open hostility toward defense counsel in this capital case— hostility that does not find justification in this record.

594 N.E.2d at 1171–72, 171 Ill.Dec. 643. Nevertheless, the appellate court concluded that because the trial judge eventually heard the points defense counsel wished to make, the trial judge's hostility did not amount to a prejudgment of the issue on remand. *Id.* at 1172, 171 Ill.Dec. 643. Although a trial court's determination of whether a *prima facie* case existed under *Batson* will ordinarily not be disturbed, the Illinois Appellate Court concluded after reviewing the entire record that Coulter had indeed established a *prima facie* case of purposeful racial discrimination in the jury selection process and that the trial court's finding to the contrary was against the manifest weight of the evidence. *Id.* at 1172–73, 171 Ill.Dec. 643. In so concluding, the state appeals court emphasized the "disproportionate use of strikes against minority venirepersons," that the defendant was African–American and the victim a Caucasian policeman, and that race was the only common trait the excluded jurors shared. *Id.* at 1173, 171 Ill.Dec. 643. The appeals court then noted that under *Batson*'s second step, the burden shifted to the state to come forward with "clear, reasonably specific, legitimate and race-neutral explanations for striking the venirepersons." *Id.* Because the question whether a *prima facie* case has been rebutted is a "factual question grounded in credibility," the Illinois Appellate Court reviewed with "great deference" the trial judge's alternate holding that the state had acted race neutrally. *Id.* at 1173–74. *Cf. United States v. James*, 113 F.3d 721, 728 (7th Cir.1997) (holding in a federal direct criminal appeal that the clearly erroneous standard of review applies to the trial court's determination that a prosecutor's explanations for peremptory challenges were race-neutral); *United States v. Carter*, 111 F.3d 509, 512 (7th Cir.1997) (same). After a lengthy juror-by-juror examination of the stricken venirepersons, the appeals court concluded the trial judge was not clearly erroneous in concluding there had been no purposeful discrimination. *People v. Coulter*, 171 Ill.Dec. 643, 594 N.E.2d at 1176. It is worth noting that even though the appellate court considered the totality of the circumstances when it concluded that Coulter had established his *prima facie Batson* violation, see *id.* at 1173, its consideration of the state's rebuttal evidence was limited to a juror-by-juror inquiry.

The district court first received Coulter's *pro se* petition for a writ of habeas corpus on January 28, 1993. Because it believed Coulter had procedurally defaulted both his claim regarding the procedures in the trial court's *Batson* hearing and his substantive *Batson* claim, the district court denied relief on May 24, 1993. We reversed that decision as to the substantive *Batson* claim, however, and

remanded the case to the district court to consider the issue on the merits. See *Coulter v. Gramley*, 93 F.3d 394 (7th Cir.1996). The district court duly considered the merits of the substantive *Batson* claim on remand, and on November 15, 1996 agreed that Coulter was entitled to a writ of habeas corpus that would be stayed provided that the State of Illinois granted Coulter a new trial within a reasonable period of time not to exceed 120 days. The State now appeals from that decision.

## II

Courts seeking to assess the merit of a defendant's claim that the government exercised its peremptory challenges in violation of the Equal Protection Clause must follow a well established framework. First, the defendant must establish a *prima facie* case of purposeful discrimination, which requires a showing: "(1) that he [or she] was a member of a cognizable racial group; (2) that the prosecutor exercised peremptory challenges to remove persons of the defendant's race from the venire; and (3) that there were sufficient facts and circumstances to raise an inference that the prosecution utilized the peremptories to exclude members from the venire on the basis of race." *Holder v. Welborn*, 60 F.3d 383, 388–89 (7th Cir.1995) (citing *Batson*, 476 U.S. at 96, 106 S.Ct. 1712); see also *Mahaffey v. Page*, 151 F.3d 671, 675–76 (7th Cir.1998). If the defendant succeeds in clearing this preliminary hurdle, "the burden shifts to the government to articulate race-neutral justifications for striking" the venirepersons in question. *Holder*, 60 F.3d at 389 (citing *Batson*, 476 U.S. at 94, 106 S.Ct. 1712). The government's explanation at this stage "need not rise to the level justifying exercise of a challenge for cause," but it must provide legitimate reasons that are "clear and reasonably specific" and "related to the particular case to be tried." *Cf. Batson*, 476 U.S. at 97–98 & n. 20, 106 S.Ct. 1712 (internal quotations omitted). Finally, if the government meets its burden, the trial court has the responsibility of determining if the defendant has indeed established purposeful discrimination; see *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*per curiam*); *Batson*, 476 U.S. at 98, 106 S.Ct. 1712; *United States*

*v. Lewis*, 117 F.3d 980, 983 (7th Cir.1997); *Holder*, 60 F.3d at 389. See also *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (extending the *Batson* framework to peremptory challenges exercised on the basis of gender); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (extension of *Batson* to civil context).

Although the basic *Batson* framework is familiar, our analysis of the framework is affected by the fact that Coulter's case is a collateral attack under § 2254. When the district court considered the merits of Coulter's *Batson* claim, the prevailing law in this Circuit required it to apply the newly enacted habeas provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2254. See *Lindh v. Murphy*, 96 F.3d 856 (7th Cir.1996), *rev'd by* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Since then, however, the Supreme Court ruled that the substantive standards of the AEDPA do not apply to cases pending at the time of the act's enactment on April 24, 1996. *Lindh v. Murphy*, 117 S.Ct. 2059 (1997). Because Coulter filed his habeas petition with the district court in 1993, we therefore must now assess his petition under the pre-AEDPA standards. See 28 U.S.C. § 2254 (1994). (This means, among other things, that the government's argument that the district court applied the wrong section of the AEDPA when conducting its analysis below is moot.)

We therefore turn to the pre-AEDPA law governing the habeas review of *Batson* claims. Under the old version of the habeas statute, factual determinations made after a hearing on the merits are entitled to a presumption of correctness if fairly . supported by the record considered as a whole. 28 U.S.C. § 2254(d) (1994). A petitioner may rebut this presumption with "convincing evidence." *Id.* Most mixed questions of law and fact that require the application of constitutional principles to historical fact receive *de novo* review. See *Thompson v. Keohane*, 516 U.S. 99, 111–12, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *cf. Ornelas v. United States*, 517

918

U.S. 690, 697–99, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). A state court's finding whether the prosecutor at trial showed purposeful discrimination in her exercise of peremptory challenges is a question of fact. See *Hernandez v. New York*, 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (like other areas of equal protection law, *Batson*'s treatment of intent to discriminate is a "pure issue of fact" subject to deferential review) (Kennedy, J., plurality); *id.* at 372, 111 S.Ct. 1859 (agreeing with plurality that findings as to discriminatory intent are reviewed for clear error) (O'Connor, J., concurring). Accordingly, for the purpose of § 2254 review, we must give the state court's findings of fact on Coulter's *Batson* claim the statutory presumption of correctness. See, *e.g.*, *Jones v. Jones*, 938 F.2d 838, 841–42 (8th Cir.1991); *Nevius v. Sumner*, 852 F.2d 463, 469 (9th Cir.1988); see also *James*, 113 F.3d at 728; *Carter*, 111 F.3d at 512 (deferential standard of review for *Batson* findings on direct federal appeal). Nevertheless, a presumption of correctness is not a rubber stamp; the presumption can be rebutted by "convincing" evidence. 28 U.S.C. § 2254(d) (1994). Furthermore, under the analogous abuse of discretion standard of review, we note that an error of law underlying a decision can lead to reversible error. See *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.").

### III

Jury selection in Coulter's case began on September 9, 1987. The trial judge, in part out of concern (ironically) for preventing problems with *Batson*, relied on an unorthodox procedure for dealing with each side's use of its peremptory challenges. Instead of allowing each side to exercise its challenges until such time as an objection was raised, the trial judge simply stated that after it questioned each set of jurors, it would take a recess during which each side would compile a list of challenges. Each side would then be required to state on the record its legitimate reasons for each challenge.

By adopting this procedure, the trial judge completely bypassed the stage at which the defendant objects to the state's use of its peremptory challenges and establishes his *prima facie* case of purposeful discrimination in a deliberate proceeding. The lack of a proper *Batson* structure led to a record so opaque that it required a remand to illuminate the judge's reasoning process. But, as our account of the proceedings above makes clear, the trial judge squandered the opportunity the appellate court had given him to engage in a more careful, structured *Batson* analysis. In this crucial respect, Coulter's case stands in marked contrast to that of his fellow Illinoisan Mahaffey. See *Mahaffey v. Page, supra*, 151 F.3d 671, 679–80 (characterizing the record there as one in which "the judge conducted a painstaking, thoroughly detailed analysis" of the reasons for excluding certain jurors). In a sense, *Mahaffey* presented the obverse of the issue here. In *Mahaffey*, the only *Batson* hearing that took place was one that was formally limited to the question whether the defendant could establish a *prima facie* case of discrimination. Reviewing the district court's decision to deny a writ of habeas corpus to Mahaffey, this court concluded (albeit over a vigorous dissent) that the state court had so carefully elicited and evaluated the pertinent information that its conclusion that the defendant failed to make a *prima facie* showing could be extended to encompass a finding of no purposeful discrimination. In Coulter's case, the loose approach to proper *Batson* procedure in the state court forecloses that possibility for us. We note as well that every court before ours that considered Mahaffey's *Batson* claim concluded that he had not established a *prima facie* case, whereas the Illinois Appellate Court and the district court both came to the opposite conclusion with respect to Coulter.

■ We find the state appellate court's evaluation of Coulter's *prima facie* case to be well supported in this record. As an African–American, Coulter is a member of a cognizable racial group. Of the peremptory challenges actually exercised, the state used all but one to remove AfricanAmerican jurors from the venire panel. *Cf. McCain v. Gramley*, 96 F.3d 288, 291 (7th Cir.1996) (pattern

of strikes used is relevant to establishment of *prima facie* case). The prosecution also used 90% of its peremptories against African-Americans where only 16 of 55 persons in the total venire were AfricanAmerican. While we cautioned in *McCain* against *necessarily* finding a racially discriminatory pattern of strikes by comparing the percentage of peremptories used against minority jurors with the racial composition of the entire venire, see *id.* at 291–92, in Coulter's case this factor is plainly relevant since there are confluent race related patterns in both the absolute number of strikes used, and the percentage of strikes used against African-Americans as compared to their representation in the overall venire. *Cf. id.* (although African-American jurors were struck at a "much higher proportion" than their representation in the total venire, in absolute terms only two of five peremptories actually exercised were against African-Americans). See also *United ed States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 1488, 134 L.Ed.2d 687 (1996) ("[T]he significance [of a peremptory challenge against a minority venireperson] may differ if the venire consists mostly of blacks or of whites."). For these reasons, we approach this case as the Illinois Appellate Court did, and assume that Coulter established a *prima facie* case suggesting a pattern of discriminatory challenges.

■ Once the defendant makes a *prima facie* showing, the burden shifts to the state to come forward with a legitimate, race-neutral explanation for challenging each African-American juror. See *Batson*, 476 U.S. at 97–98, 106 S.Ct. 1712. *Batson* is violated if even a single potential juror is excluded for an impermissible reason. See *J.E.B.*, 511 U.S. at 142 n. 13, 114 S.Ct. 1419; see also *James*, 113 F.3d at 730. The Illinois Appellate Court's review of the prosecution's juror-by-juror justifications shows that the state's challenges, viewed one-by-one, were based on reasons previously recognized as legitimate and non-discriminatory. Edward Terry was struck because the State believed he "would have great difficulty giving the death penalty." *Cf. Pitsonbarger v. Gramley*, 141 F.3d 728, 734 (7th Cir.1998). Anthony Powe and Kevin Archibald were struck because they failed to disclose, in response to a general question asked by the judge to the jury

venire about prior personal involvement in criminal prosecutions, that they had previously been charged with crimes. Powe was also challenged on the ground that his brother had been tried by the same trial judge in an unrelated case. Teresa Brantley was eliminated on the ground that she had been unemployed for ten years. *Cf. United States v. Lewis*, 117 F.3d 980, 983 (7th Cir.1997). The State attempted to strike Jeanell Hicks for cause because it believed she had a case pending in the courts, but once that was shown to be wrong, it struck her for the alternative stated reason that "she seemed very timid and was real hesitant in answering [the court's] ... questions." *Cf. United States v. Hunter*, 86 F.3d 679, 683 (7th Cir. 1996). The State justified its strike of Adams on the ground that she was a licensed practical nurse (LPN), and it did not want her on the jury because the case might involve an insanity defense even though she had testified she could be impartial in considering that issue. *Cf. McKeel v. City of Pine Bluff*, 73 F.3d 207, 210 (8th Cir.1996). The prosecution rejected Pinkins for a similar reason, noting that her mother was a social worker at Mercy Hospital, which was where Dr. Hemmerich (a potential defense witness) had spent five or six years of his professional career. *Cf. Williams v. Chrans*, 957 F.2d 487, 490 (7th Cir.1992) (proximity). (The record does not reflect whether Dr. Hemmerich's tenure at Mercy actually overlapped with Melanie Pinkins's mother's time at Mercy Hospital, because no one ever asked Pinkins about this detail.) The reasons for striking Rhem and Igess went more to their personal lives. The State claimed it was striking Rhem because she was attending night school, had held four different jobs during the previous year, and had lived in three different locations over the same time. *Cf. Garcia v. Excel Corp.*, 102 F.3d 758, 759–60 (5th Cir.1997) (work history). It struck Igess on the basis of his response to the judge's question (posed only to Igess, and not to Caucasian men or women on the panel) whether his three children were "by the same woman." Igess replied that they were not, which prompted the State to claim it was striking him because he had three children by two different women, and because he had

been unemployed for about a year. *Cf. United States v. Hughes,* 970 F.2d 227, 231 (7th Cir.1992) (three children out of wedlock).

■ Some of the prosecution's explanations for its peremptory strikes were plainly race-neutral and legitimate such as those it exercised against Terry, Powe, and Archibald. Others were race neutral and plausibly legitimate such as the peremptories used against Brantley, Adams, Pinkins, and Rhem. However, as Coulter's defense counsel argued during one of its *Batson* objections, although the State's explanations for striking Hicks and Igess were facially race neutral— Hicks seemed "timid" and Igess's children were not "by the same woman"—the explanations also seemed to verge on the "patently absurd." Nevertheless, the Supreme Court has stated in no uncertain terms that the second step of the *Batson* analysis "does not demand an explanation [from the prosecutor] that is persuasive, or even plausible." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769 (peremptory challenge based on potential juror's facial hair). It is not until the third step of *Batson,* in which the trial court determines whether the defendant has carried his ultimate burden of proving purposeful discrimination, that the persuasiveness of the justification becomes relevant, and implausible or fantastic justifications may be found to be pretexts. *Id.* Because this case comes to us on a petition for a writ of habeas corpus seeking relief from a state court conviction, however, our review of the pretext question in step three is limited by § 2254. The presumption of correctness that § 2254(d) creates for state court fact findings requires us to defer to the appellate court's acceptance at the individual level of even the State's flimsier explanations, such as its assertion that it struck Hicks for being "timid." It is simply impossible for us to tell from the cold record whether the State's justification was pretextual. Three propositions guide our review here: first, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike," *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769; second, the "issue of discriminatory intent ... turn[s] on evaluation[s] of credibility," *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859; and third, § 2254(d) requires a habeas petitioner to advance "convincing" evidence to rebut the presumption of correctness. As long as the state court has made no legal errors, these rules normally leave a federal court little room to second guess a state court's determination on the pretext issue. *Cf. Gibson v. Bowersox,* 78 F.3d 372, 374–75 (8th Cir.1996) (even though the prosecution used all seven of its peremptories against African–Americans and "a contrary finding ... [on pretext] could have been easily justified," the state trial judge's fact findings were the crucial consideration on habeas review) (Bright, J., concurring).

Coulter's petition for habeas relief alleged in pertinent part that his "[c]onviction [was] obtained by the purposeful discrimination against African–Americans during jury selection." As we have already indicated, at first blush Coulter's effort to challenge the state trial judge's ultimate factual findings that the prosecution did not purposefully discriminate in its peremptories may seem doomed because of the § 2254(d) presumption. But the state judge made those findings without ever taking into account the totality of the circumstances on the record; instead, he looked only in an isolated way at individual jurors and individual reasons, and even in that setting he overlooked remarkable similarities between the excluded AfricanAmericans and the non-excluded Caucasians. This is another respect in which Coulter's case contrasts sharply with Mahaffey's. The *Mahaffey* majority went out of its way to stress the detailed analysis that the trial judge performed taking "the totality of the circumstances," 151 F.3d 671, 677, and "all of the evidence" into account. *Id.* at 679–80. That kind of inquiry is precisely what is lacking in the present case.

The Illinois Appellate Court criticized the trial court's decision to require the state to give its reasons for challenging each juror before the defendant raised a *Batson* issue, recognizing that this procedure impeded clear analysis of the issues. 171 Ill.Dec. 643, 594 N.E.2d at 1172. Ironically, the trial judge was aware during *voir dire* of the emerging *Batson* problem but its significance escaped him. At one point, he exclaimed: "Oh, boy, this is a winner as far as any *Batson* motions [are] concerned." On two

other occasions, the judge editorialized that peremptory challenges should be eliminated entirely. But these statements were obviously made out of frustration, not as a formal assessment of the merits of a *Batson* argument. In fact, each of the three times Coulter moved for a mistrial on the basis of *Batson*, the trial judge denied the motion summarily and without analysis.

■■■■ The *Batson* decision makes it clear that, one way or another, a trial court must consider all relevant circumstances before it issues a final ruling on a defendant's motion:

> [i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative.

476 U.S. at 96–97, 106 S.Ct. 1712. *Cf. Armstrong*, 116 S.Ct. at 1488 (trial judge examines "entire *res gestae*" of jury selection). Particularly in light of the Supreme Court's sweeping definition of what can count as a racially neutral ground for exercising a peremptory challenge, see *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769, the crucial and determinative inquiry in a *Batson* claim is whether the state has treated similarly situated venirepersons differently based on race. See, e.g., *Turner v. Marshall*, 121 F.3d 1248, 1251–55 (9th Cir.1997) (granting relief and citing cases).

■■■■ Because of the trial court's failure to consider the totality of the circumstances, it never evaluated the differential manner in which the state handled—or rather, failed to handle—nonminority jurors who were similarly situated to the African–Americans the prosecution struck. A facially neutral reason for striking a juror may show discrimination if that reason is invoked only to eliminate African–American prospective jurors and not others who also have that characteristic. See, e.g., *Turner*, 121 F.3d at 1254; *United States v. Elliott*, 89 F.3d 1360, 1367 (8th Cir.1996); *United States v. Alvara-*

do, 923 F.2d 253, 256 (2d Cir.1991). Suppose, for example, the state struck an African–American veteran in a prosecution against a corrupt police officer, on the stated ground that prior military service might tend to make the juror too sympathetic to the defendant. On its face, this is a neutral reason. But if the record shows that the state did not strike the Caucasian or Hispanic veterans from the same panel, even though it had plenty of peremptories still available to it, an inference of discrimination arises. In the present case, even though the State struck Pinkins because her mother worked at Mercy Hospital, it did not challenge Larry Saverslak (Caucasian), whose wife was a registered nurse. Likewise, at the same time the State claimed it was striking Adams because she was an LPN who might know too much about mental illness (even though, so far as the record reveals, she was not involved in the mental health field), it did nothing to remove Bertha Fangman (Caucasian) from the panel, even though her father had been treated for severe depression. Regrettably, the juror-by-juror inquiry that the trial judge conducted, unsupplemented by any final look at the record as a whole despite counsel's efforts to present this evidence to the court, practically guaranteed the conclusion that the prosecution was acting race neutrally. (Indeed, in light of *Purkett v. Elem, supra*, a procedure that omits the totality inquiry would exonerate the user of peremptories in virtually every case, unless the lawyer was foolish enough to announce her discriminatory purpose in so many words.) *Batson* requires more: somehow, at some point, the trial court must evaluate the broader pattern of strikes, so that it can detect situations like those presented by Pinkins and Adams, where prospective jurors arguably are being treated dissimilarly from their non-minority counterparts. We therefore hold that the state trial court violated *Batson* by adhering to a procedure that precluded it—both as a systematic matter and in fact—from performing a "similarly situated" analysis based on the "totality of the circumstances."

It is important to underscore the limits of today's opinion. In light of the deferential standard of the post-AEDPA § 2254 and the

perfunctory quality of the second step of a *Batson* inquiry after *Purkett v. Elem*, it is more important today than ever that the *Batson* inquiry not omit consideration of the totality of the circumstances, both for itself and as it relates to the evaluation of similarly situated potential jurors. We express no opinion on how this case would be resolved under the far more deferential rules established by the AEDPA. Under the preAEDPA standards that apply here, we agree with the district court that Coulter's rights under *Batson* were denied.

■ The final question we must resolve concerns the proper remedy for the violation we have found. The district court ordered Coulter to be released unless the State retried him within 120 days. We think, however, that an intermediate solution is possible, which is to require Coulter to be released unless within 120 days the state court holds a new hearing on his *Batson* claim at which the proper methodology for evaluating his claim is followed—that is, in addition to reviewing the reasons given for striking each individual prospective juror, it considers the totality of the circumstances and compares the prosecutor's strikes against African–Americans against its treatment of similarly situated Caucasians. In the interest of comity and the possible efficiency of avoiding a new trial, we conclude that this more limited grant of the writ is the proper course to follow. We therefore AFFIRM the judgment of the district court, but we modify its order to grant the writ unless within 120 days the state court holds a new hearing on Coulter's *Batson* claim in accordance with this opinion. e with this opinion.