In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 06-2457

DWAYNE COULTER,

*Petitioner-Appellee,*

*v.*

TERRY MCCANN, Warden,

*Respondent-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 93 C 732—**Suzanne B. Conlon**, *Judge.*

———————

ARGUED SEPTEMBER 20, 2006—DECIDED APRIL 20, 2007

———————

Before ROVNER, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* Dwayne Coulter's case has been traveling through the state and federal judicial systems for twenty years. Coulter was convicted of first-degree murder and conspiracy to commit murder by an Illinois state court in 1987. *Illinois v. Coulter*, 594 N.E.2d 1163 (Ill. App. Ct. 1992) ("*Coulter I*"). His case first arrived in federal court more than a decade ago, in 1996, when he petitioned for habeas corpus relief. Throughout these proceedings, Coulter, who is African-American, has been contending that the state's use of its peremptory strikes during the jury selection process violated his rights under the Equal Protection Clause of the U.S. Constitution. See *Batson v. Kentucky*, 476 U.S. 79 (1986).

Although the jury in Coulter's criminal trial included three jurors who were African-American, the state used nine of the ten peremptory strikes it exercised to exclude African-American venirepersons.

In 1998, the district court issued Coulter a conditional writ and this court affirmed that decision. *Coulter v. Gramley*, 945 F. Supp. 1138, 1143 (N.D. Ill. 1996); *Coulter v. Gilmore*, 155 F.3d 912, 922 (7th Cir. 1998) ("*Coulter II*"). Our decision gave the state the choice of releasing him or holding a new *Batson* hearing; not surprisingly, it opted for the latter. After that hearing, the state trial court found that the prosecution's reasons for its use of peremptory strikes were race-neutral; the state appellate court affirmed. *Illinois v. Coulter*, 748 N.E.2d 240 (Ill. App. Ct. 2001) *("Coulter III")*. Coulter then returned to federal court in 2005, purportedly "reinstating" his earlier habeas corpus petition. The district court concluded that the *Batson* problem remained and issued the writ, again with a stay designed to permit the state to retry him within 120 days. *Coulter v. Battaglia*, 2006 U.S. Dist. LEXIS 8869, *20 (N.D. Ill. 2006). On July 5, 2006, this court issued a stay of the district court's order directing that Coulter be released, pending resolution of this appeal.

We conclude that Coulter's 2005 petition must be evaluated under the standards set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, Apr. 24, 1996. On that basis, we conclude further that while the state court's explanation of its findings leaves something to be desired, we cannot say that its decision is either contrary to or an unreasonable application of *Batson*. We therefore reverse and remand so that judgment may be entered in favor of Warden McCann.

**I**

Given the lengthy history of this case, a brief summary of the underlying facts and proceedings is in order before addressing the merits of Coulter's petition.

**A**

In 1985, Coulter was riding in a car with his two co-defendants when the vehicle was stopped by Officer Michael Ridges of Prospect Heights, Illinois, because it had no visible license plates. Officer Ridges called in the traffic stop. Shortly after the stop, another call reported that an officer had been shot at that location. The first officer to respond to the second call found Ridges already dead with a bullet wound to the head. Investigators found the driver's license of one of Coulter's co-defendants on the scene. Later that day, Coulter and his co-defendants were spotted and pulled over.

Coulter was charged with two crimes: the murder of Ridges and conspiracy to commit the murder of a Robert Fischer. During the jury selection process for Coulter's trial, the prosecution exercised ten of its 14 allowed peremptory challenges. Of the ten, it used nine to strike African-American prospective jurors. It used the tenth strike against a non-African-American juror who said that he could not impose the death penalty against a criminal defendant. Coulter's attorney moved three times for a mistrial on the ground that the state's use of peremptory challenges violated the Equal Protection Clause. Each time, the trial judge denied the motion. The final jury consisted of eight Caucasians, one Hispanic and three African-Americans. The two alternates were also African-American.

At trial, Coulter's defense centered around his claim that the shooting was an accident that occurred when he

slammed the gun on top of the hood of the stopped car after he became angry while talking to Ridges. This was not enough to raise a reasonable doubt in the mind of the jury, which convicted him. The court imposed a sentence of life imprisonment automatically when the jury did not authorize the death penalty.

On direct appeal, Coulter raised his *Batson* claim, among many others. In 1990, the Illinois appellate court, while retaining jurisdiction over Coulter's appeal, ordered the trial court to clarify the record regarding the jury selection process. Four months later, in early 1991, the issue was briefed, attorneys appeared again before the trial court, and the trial court concluded that there was no *Batson* violation. When the case returned to the Illinois appellate court, it affirmed the trial court even though it viewed the trial court's procedure as "less than ideal." *Coulter I*, 594 N.E.2d at 1191. The Supreme Court of Illinois denied Coulter's petition for leave to appeal. *Illinois v. Coulter*, 602 N.E.2d 461 (Ill. 1992).

Coulter then successfully petitioned in federal district court for a writ of habeas corpus based on the alleged *Batson* violation. *Coulter v. Gramley*, 945 F. Supp. at 1143. On appeal, we agreed with the district court that the state court had not followed the proper procedure for assessing Coulter's *Batson* claim. We also found troubling the prosecution's stated reasons for striking prospective jurors Melvin Igess, Jeanell Hicks, Melanie Pinkins, and Marcina Adams—all African-Americans. *Id.* at 920-21. In the end, we affirmed the district court's judgment, but we modified its order to issue the writ unless within 120 days the state chose to return to state court for a new *Batson* hearing. *Coulter II*, 155 F.3d at 922. We also described the appropriate methodology for such a hearing:

> [I]n addition to reviewing the reasons given for striking each individual prospective juror, [the trial court

must] consider[ ] the totality of the circumstances and compare[ ] the prosecutor's strikes against African-Americans against its treatment of similarly situated Caucasians.

*Id.* at 922.

The state opted for the new *Batson* hearing. In 1998, the state trial court conducted a new hearing, at which it considered all of Coulter's arguments and assessed on the record some of the reasons given by the prosecution for striking some of the African-American potential jurors in Coulter's 1987 trial. The court concluded that the prosecution's reasons for its strikes were "credible and . . . not pretextual." The trial court also volunteered its opinion of the prosecutors' character—an unhelpful step in this particular case, given the fact that the trial judge had no experience with those individuals as prosecutors in Coulter's or any other person's trial. The Supreme Court of Illinois has allowed the consideration of a prosecutor's character in a *Batson* analysis, but in a much more limited way and not at the expense of full consideration of the required factors. See *Illinois v. Andrews*, 588 N.E.2d 1126, 1134 (Ill. 1992) (holding that "the trial judge's experience with local prosecutors and knowledge of local conditions are relevant factors in a prima facie [*Batson*] case analysis, [but] this court has never intimated that such considerations are dispositive of this issue").

On appeal from the trial court's reaffirmation of its earlier conclusion that *Batson* was not violated, the state appellate court affirmed. *Coulter III*, 748 N.E.2d at 252. The Supreme Court of Illinois again denied Coulter leave to appeal. *Illinois v. Coulter*, 763 N.E.2d 321 (Ill. 2001). The U.S. Supreme Court, however, granted Coulter's petition for certiorari and vacated the state appellate court's decision. *Coulter v. Illinois*, 537 U.S. 1230 (2003).

The Court instructed the Illinois appellate court to reconsider its decision in light of *Miller-El v. Cockrell*, 537 U.S. 322 (2003) ("*Miller-El I*").

The state appellate court took up the case again, but it decided that *Miller-El I* shed no new light on Coulter's claims. Once again, it held that Coulter's *Batson* rights had not been violated. *Illinois v. Coulter*, 799 N.E.2d 708, 717 (Ill. App. Ct. 2003) ("*Coulter IV*"). Meanwhile, Coulter's state court petition for post-conviction relief was making its way through the Illinois courts, resulting in two additional decisions from the Illinois appellate court on an ineffective assistance of counsel claim, a remand by the Supreme Court of Illinois, and a denial of certiorari by the U.S. Supreme Court.

On November 23, 2005, after the state courts reached their final decision on the merits of Coulter's challenges to his 1998 *Batson* hearing, Coulter filed a motion in federal court asking to "reinstate" his federal habeas corpus petition. The district court granted the motion, apparently on the assumption that it had never really relinquished jurisdiction over the case during the new round of *Batson* proceedings triggered by the conditional writ issued after *Coulter II*. This time, Coulter argued that he was entitled to relief based not only on *Batson* but also on *Miller-El I* and the Supreme Court's subsequent decision in *Miller-El v. Dretke*, 545 U.S. 231 (2005) ("*Miller-El II*"). The latter decision is the Supreme Court's last word on the use of peremptory strikes against members of a specific race. The district court granted Coulter's petition, *Coulter v. Battaglia*, 2006 U.S. Dist. LEXIS 8869 at *20, and the state has appealed.

**B**

In *Batson*, the Supreme Court wrote that "[t]he standard we adopt under the Federal Constitution is designed to

ensure that a State does not use peremptory challenges to strike any black juror because of his race." *Batson*, 476 U.S. at 99, n.22. We have interpreted that to mean that the exclusion of even a single prospective juror based on race violates the defendant's constitutional rights. *Splunge v. Clark*, 960 F.2d 705, 708 (7th Cir. 1992).

The Supreme Court's decisions in *Miller-El I* and *Miller-El II* reaffirmed the Court's core substantive holding in *Batson*. The Court also described succinctly the "three-part process for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause":

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. . . . Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. . . . Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El I*, 537 U.S. at 328-29 (internal citations omitted). The burden is on the defendant to show that her rights have been violated. *Id.* at 338.

The trial court must consider all relevant circumstances as it assesses the first step. The *Batson* Court elaborated as follows:

> For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative.

476 U.S. at 97. In the end, the defendant must simply present evidence that "gives rise to an inference of discriminatory purpose." *Id.* at 93-94.

In *Miller-El II*, the Court clarified the way in which jurors of different races should be compared. It called for direct comparisons between "similarly situated" venirepersons of different races. *Miller-El II*, 545 U.S. at 247. The *Miller-El II* Court rejected the standard put forth by the dissent in both *Miller-El* cases that "[s]imilarly situated does not mean matching any one of several reasons the prosecution gave for striking a potential juror—it means matching all of them." *Id.* at 247, n.6. The Court explained that

> [n]one of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. . . . A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.

*Id.* It is in this pragmatic light that the state court had to assess the potential jurors in Coulter's case.

At the second step, the prosecutor may set forth any race-neutral reason for the use of a strike against a prospective juror, even if it is not a "persuasive, or even plausible" reason. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). As Justice Breyer noted in his concurrence in *Miller-El II*, under *Purkett* even something as foolish as the notion that "mustaches and beards look suspicious" could satisfy the second step. 545 U.S. at 267 (Breyer, J., concurring) (quoting *Purkett*, 514 U.S. at 768). The point of *Batson* is to avoid invidious distinctions based on race or other protected characteristics; it is not to ensure wise decisions.

The third step requires the court to weigh the evidence and determine whether the prosecution's nondiscriminatory reason for the strike is credible or if the defense has shown purposeful discrimination. As the Court put it in *Miller-El II*, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El II*, 545 U.S. at 241.

The *Miller-El II* Court also had before it evidence that the local prosecutor's office had used a particular process to manipulate the racial composition of the jury in the past. *Id.* at 254. This is different, we note, from a judge's personal testimonial to the character of the state's attorney in a particular case, which seems to be what happened here. At no point in *Batson*, *Miller-El I*, or *Miller-El II* did the Court endorse anything like this. We realize that judges need to make credibility determinations, but it is very troubling to base such decisions on personal relationships outside of the courtroom. *Miller-El I* provides the better way in which to approach the credibility question, by calling for an assessment of "how reasonable, or how improbable, the [prosecutor's] explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy." *Miller-El I*, 537 U.S. at 339.

## II

### A

Although we assessed Coulter's claim under the pre-AEDPA version of 28 U.S.C. § 2254 the last time this case was before us in *Coulter II*, and the parties have not challenged that approach, we have concluded that cir-

cumstances have changed enough at this stage that the correct law to apply is the post-AEDPA standard. Coulter's original petition was filed before AEDPA's effective date (April 24, 1996), and that is the petition that was before us in 1998. As a result of our decision, however, a conditional writ of habeas corpus issued. As of that time, there was nothing pending before either this court or the district court. There is no authority in the habeas corpus statute for a federal court to remand or transfer a proceeding to the competent state court. This would have been clear if the state had decided to allow Coulter to go free. It would also have been clear if the state court had concluded after the hearing that *Batson* was violated; the state court then would have been entitled to order a new trial for Coulter. It is just as true in the situation that unfolded, in which the state accepted the option of holding a new *Batson* hearing, and the state court decided that Coulter's conviction could stand. When Coulter returned to federal court in November 2005, there was nothing to reinstate. What he filed was in substance a new petition for a writ of habeas corpus from the new holding. (We note that this was not a "successive" petition, because he was challenging a new ruling of the state court.) Since he filed the new petition long after April 1996, his case falls under the current version of 28 U.S.C. § 2254.

As the Supreme Court noted in *Carey v. Musladin*, 127 S.Ct. 649 (2006), an application for a writ of habeas corpus may not be granted to a state prisoner whose claim was adjudicated on the merits in state court unless the state court either reached a decision that was "contrary to" "clearly established Federal law, as determined by the Supreme Court of the United States," or it unreasonably applied such a law. *Id.* at 652-53; see 28 U.S.C. § 2254(d)(1). Citing *Williams v. Taylor*, 529 U.S. 362 (2000), the Court also underscored the fact that "'clearly established Federal law' in § 2254(d)(1) 'refers to the

holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.' *Id.*, at 412." 127 S.Ct. at 653.

**B**

Even if the *Batson* hearing that the state court undertook in response to our 1998 conditional grant of the writ was flawed, there can be no doubt that this was the option the state chose. When Coulter challenged the outcome through his new petition for habeas corpus relief, the federal district court was free to evaluate the state court proceeding on the merits (though, as we have just said, this should have been done with the AEDPA standards in mind). If the ultimate conclusion of the state court was contrary to, or an unreasonable application of, *Batson*, then Coulter would be entitled to another writ—perhaps the usual one in which the state is given the choice between release and a full retrial. If the outcome of the state court proceedings meets the standards set forth in § 2254, as interpreted by the Supreme Court of the United States, then Coulter's petition must be denied. Our review of the district court's judgment in Coulter's favor is *de novo*, since we are assessing as a matter of law the question whether the state court stayed within the generous boundaries that AEDPA establishes.

In his brief to this court, Coulter claims that his rights were violated because African-American prospective jurors were excused for reasons that applied with equal force to non-African-Americans who were not excused. He focuses on three of the African-American prospective jurors whom the prosecutors struck, Melvin Igess, Melanie Pinkins, and Marcina Adams, to "demonstrate[ ] [the prosecution's] purposeful discrimination." Although the state argues that Coulter's *Batson* claims have centered around only a few of the nine African-American prospec-

tive jurors dismissed by the prosecution and that we are limited to those examples at this stage, we are satisfied that Coulter has properly preserved his right to complain about the broader pattern of the prosecution's use of its peremptory challenges to manipulate the racial composition of the jury. We proceed on that basis.

## III

On the merits, no one seriously argues that the state court issued a decision that was "contrary to" *Batson*. As is often the case, we must decide whether the state court's application of the *Batson* procedure, as interpreted further by *Miller-El II*, was unreasonable. It is helpful, in assessing that question, to review the 1998 hearing as a whole. We begin with the state trial court's findings from the 1998 *Batson* hearing. Because the court did not admit any new evidence at that hearing, the only question is whether it properly assessed the record that we have already seen. In approaching this question, we recall that before a writ may issue, "[a] state court decision must be more than incorrect from the point of view of the federal court; AEDPA requires that it be 'unreasonable,' which means something like lying well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2001).

The state trial court was bound, by *Batson* and later Supreme Court cases, to analyze the totality of the circumstances when it reviewed the prosecution's use of its peremptory strikes. The state court judge acknowledged this fact on the record:

> I am going to consider all of the reasons for all of the 9 challenged jurors by the state under a totality of the circumstances test in determining the credibility of those reasons given, and I want the record to reflect

that I have read the entire transcript of the jury
selection as well as the 7th Circuit case and the
Illinois Appellate case.

The judge further explained that this analysis would
include "the breakdown of the entire venire and then that
of the actual selected jurors."

The state began by reiterating its position that each of
the peremptory challenges it exercised against the African-
American venirepersons was done for a legitimate reason.
It wanted (both before the state judge and here before this
court) to defend the outcome of the proceeding based only
on the overall numbers. As the state court noted, 29% of
the venirepersons were African-American, and 25% of the
final jurors were African-American (35% if one includes
the African-American alternates). We are dubious, given
*Batson*'s emphasis on the impermissible nature of discrimi-
nation against individual potential jurors, that this
analysis is correct. Compare *Connecticut v. Teal*, 457 U.S.
440, 442 (1982) (rejecting the same kind of "bottom line"
approach for Title VII employment discrimination cases).
Even if overall numbers had some evidentiary value, the
proper comparison would, we assume, be between the
percentage of African-American venirepersons and the
percentage of the prosecution's challenges used to dismiss
African-American venirepersons. If only race-neutral
reasons were employed, then one would predict that the
prosecutors would have used roughly the same percentage
of strikes against African-American venirepersons as there
were African-Americans in the juror pool. Instead, the
state used 90% of its strikes against the 29% of the pool
that was African-American. At a minimum, this sug-
gests that the state could not prevail based only on the
numbers. We therefore turn to the analysis of the individ-
ual venirepersons.

In our 1998 opinion, we highlighted the potentially
troublesome use of strikes against Melvin Igess, Melanie

Pinkins, Marcina Adams, and Jeanell Hicks. We therefore take another look at them as we examine the state court's conclusions from the 1998 *Batson* hearing.

The prosecution gave two reasons during voir dire for using one of its strikes against Melvin Igess, an African-American male. First, Igess had three children by two different women. Second, Igess had been unemployed for about one year, and in the prior year he had been employed only for a couple of months. After he was dismissed, defense counsel objected, arguing that the prosecution's reasons for striking Igess and the previous rejected juror, Hicks, were "patently absurd."

Igess, Coulter argues, was indistinguishable from William Martin, a non-African-American venireperson who was not dismissed by the prosecution. Although Martin had four children, he was not asked (as was Igess) whether his children had the same mother. Neither was that rather intrusive question asked of another non-African-American prospective juror, Randy Dove, even though his two children were seven years apart in age. The state points out in its brief that it was the judge, and not the prosecutors, who was asking the questions. The state also notes that the trial judge asked one other prospective juror whether his children shared the same mother. This fact, however, hardly helps it: the other juror, Kevin Archibald, was also African-American. (Archibald was struck for previously having been charged with theft.) The state's additional reason for striking Igess was his employment record. In its brief to this court, the state admits that this was a bit absurd. The prosecutor's apparent expectation that Igess should have had an eight-year employment record would have required Igess to have been employed full-time beginning at age 13.

Under *Batson*, *Miller-El I*, and *Miller-El II*, Coulter presented enough to establish a prima facie case of

discrimination. The state properly responded to Coulter's showing by offering reasons that were race-neutral (unstable family relationships, employment record). At step three of the analysis, therefore, the state trial court had to decide whom to believe. (We are certainly aware that this was a tall order in a hearing held some twelve years after the trial, but we are confident that all parties did their best.) The trial judge accepted the prosecutor's race-neutral explanation, and we have no principled reason that would cause us to reject that decision. We conclude, therefore, that Coulter cannot rely on the elimination of Igess to support his petition.

Melanie Pinkins is the next prospective juror whose elimination was questionable. The prosecution stated that it struck her because her mother worked at the same hospital as the defense insanity expert. It did so despite the fact that Pinkins testified that her mother was "a social worker . . . [who] works with older patients," and therefore was unlikely to have crossed paths with the defense expert. At the original proceeding, when defense counsel objected to the strike of Pinkins and asked that she first "be questioned as to what years [her mother] was working" at the hospital where the defense expert once worked, the trial judge responded, "They are excused. After what you just did, they are excused." What the defense counsel had just done was to strike a white prospective juror, after which the trial judge openly chastised him:

> Court: You talk about reversal for racism. Fine. Let the record show that—that he was white, and every [strike] you used except one was white and you said—you said . . . [defense counsel interrupted to point out he had struck two non-whites] . . . you said a couple of them because they had open cases. Yet, you accepted others.

Defense counsel: Which? I don't understand, Judge. Which others?

Court: You accepted—you accepted the two individuals, one was a Puerto-Mexican or Puerto Rican. I don't know what he was, and the other individual was a black individual, and they are two excellent ones, but you excused white people . . . because they had cases . . . that were open.

Defense counsel then asserted that the reason for all of his strikes was their connection to law enforcement, but the court dismissed this explanation. Meanwhile, the prosecution refrained from using a peremptory challenge to strike a white prospective juror, Richard Mason, even though Mason's daughter was a supervisor at a mental health facility where the same defense expert had worked previously.

Once again, this record is easily enough to support a prima facie case of discrimination. And once again, the reasons that the state offered at step two for removing Pinkins from the jury were facially nondiscriminatory. The state judge at the 1998 hearing accepted the prosecution's explanation that current employment at the same hospital as the expert was the real reason for the strike. The judge also compared Pinkins to another prospective juror, Saverslak, whose wife was a registered nurse, and noted first that his wife did not work at the same hospital as the expert and second that it was the defense who excused Saverslak. These are factually based credibility findings that, once again, are not so clearly contradicted by the record that we would be entitled to second-guess the state court's decision.

Next, we consider prospective juror Marcina Adams. The prosecution said that it used a strike against her because she was a nurse and might have specific knowledge about mental illness, which was at issue in the trial.

In the 1998 hearing, defense counsel pointed to non-African-American jurors who were not excused even though they had experience with mental illness. Bertha Fangman, for example, had testified that her father had been treated for severe depression. The state judge was entitled to take the position, however, that a medical professional and a layperson are not similarly situated with regards to mental illness expertise. Although the court's explanation left a great deal to be desired, it is the ultimate decision that matters for our purposes, and the ultimate decision that it was not discriminatory to strike Adams but not Fangman was within the bounds of reason.

Last is Janelle Hicks. The prosecution first tried to strike her for cause because it thought that she had a lawsuit pending. When the state's attorneys learned that this was not the case, they offered another explanation for the strike—they said that "she seemed very timid and was real hesitant in answering [the court's] questions." Unlike the other three specific venirepersons we have discussed, Hicks did not have a similarly situated non-African-American counterpart who was not excused. Although there may be something slightly suspicious about the shift in rationale, the state court was not compelled to find discrimination on that basis. We thus conclude that the state court did not unreasonably apply *Batson* when it concluded that the Hicks challenge was nondiscriminatory.

By now, the courts of Illinois have found on three separate occasions that Coulter's *Batson* rights were not violated in the proceedings that led to his conviction. The state trial court judge concluded the 1998 hearing by stating that "[r]eading in between the lines it appears that the State was looking for fair jurors who were also perhaps stable, law-abiding, working-type of people." The judge continued that "an argument certainly could be made that a prosecutor of a defendant charged with the

murder of a police officer would want as a juror someone who was strong, stable, not a follower, but rather a leader, someone who is sure of their convictions."

If we had conducted the original *Batson* hearing, it is possible that we may not have been as convinced by the record as the state trial court was in 1998, but that is not our role. Even though the state judge who presided over the 1998 hearing failed to explain her conclusions with respect to each and every challenged venireperson, that is not a reason to reject the outcome of the proceeding. As we have noted, "AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court." *Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005). Here, the trial court judge explicitly stated that she considered the totality of the circumstances that applied to every peremptory strike. We take her at her word.

## IV

Although the jury selection process that took place in 1986 was far from perfect, our focus here must be on the question whether the state courts applied *Batson* unreasonably, when all was said and done. Without in any way criticizing the district court's honest assessment of the case on the merits, we conclude that this is one of the many cases in which we must defer to the state court's decision. We therefore REVERSE the district court's decision issuing the writ and REMAND for dismissal of this petition.

No. 06-2457                                                             19

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*