In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-2892

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

WAYNE STEPHENS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 661—**Matthew F. Kennelly**, *Judge.*

ARGUED MAY 24, 2007—DECIDED JANUARY 31, 2008

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* This is the second time this court has considered the case of defendant Wayne Stephens. Stephens, a Yale-educated corporate executive in New York, was convicted of three counts of wire fraud and was sentenced to 21 months' imprisonment. We previously affirmed the conviction against a sufficiency-of-the-evidence challenge. *United States v. Stephens*, 421 F.3d 503 (7th Cir. 2005) ("*Stephens I*"). In that opinion, this court also concluded that a *prima facie Batson* violation existed under step one of the three-part *Batson* test. *See Batson v. Kentucky*, 476 U.S. 79 (1986). The case was remanded to the district court for further proceedings to be conducted pursuant to steps two and three of the

*Batson* test. The district court determined on remand that the government had exercised its peremptory challenges to exclude prospective minority jurors in violation of the Constitution, and granted Stephens a new trial. The government appeals. We conclude there was no *Batson* violation and therefore reverse. The convictions are reinstated and affirmed, and the case is returned to the district court for resentencing pursuant to *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I.  HISTORY

Stephens, an African American, was an in-house manager overseeing computer and technology support at the New York City office of Accenture. Accenture is the largest consulting firm in the world, with 158,000 employees in 49 countries. *See* Wikipedia, Accenture, http://en.wikipedia.org/wiki/Accenture (last visited Dec. 10, 2007). Accenture, like many large companies, required its employees to submit a time and expense report. Accenture used a computerized program, "ARTES," as its time and expense reporting program in 2000. The ARTES system had a feature that allowed an employee to manually add money to, or deduct money from, his paycheck. Apparently, the "add to/deduct from" feature was designed for expenses that were not addressed in other parts of the ARTES program.

Stephens used the "add to" feature to add amounts to his paycheck. From April through August 2000, he added approximately $68,000 to his paychecks. Accenture did not become aware that Stephens was increasing his paycheck until August 2000, when its internal auditors identified a $22,980 "add to" request made by Stephens. Accenture fired Stephens and reported his conduct to the government.

To convict Stephens of wire fraud, the government was required to prove beyond a reasonable doubt that: "(1) there was a scheme to defraud; (2) wires were used in furtherance [of] the scheme; and (3) Stephens participated in the scheme with the intent to defraud." *Stephens I*, 421 F.3d at 507 (citing *United States v. Owens*, 301 F.3d 521, 528 (7th Cir. 2002)). It was undisputed that Stephens took the money from Accenture through the "add to" function in ARTES. It was also undisputed that Accenture transferred the money to Stephens via wire transfers from Accenture's bank in Chicago, Illinois, to Stephens's personal bank account in New Jersey. Consequently, the trial centered around whether there had been a scheme to defraud Accenture and whether Stephens had participated in that scheme.

The government presented evidence at trial that Stephens had engaged in a scheme because he disguised his "add to" requests so that Accenture would not identify them. This included Stephens's failure to submit copies of his ARTES reports to his supervisor and Accenture's accounting department, as required by Accenture procedure. Evidence was also presented that Stephens had submitted his reports for review in the period that he worked at Accenture before he began to use the "add to" feature to take money from Accenture.

On the intent issue, the government provided evidence of Accenture's personnel policies, Stephens's training on those policies, and his prior compliance with those policies before he began taking money via the "add to" function. The government also provided evidence that Stephens used the money to subsidize a lifestyle beyond his means for himself and his family. Thus, the government argued that Stephens knew that he should not take money from Accenture but did so anyway out of greed.

The government also presented evidence about how Stephens structured his "add to" requests. The first "add

to" request was for $7,800 and Stephens also had a legitimate expense of $78 during that pay period. The government argued that this demonstrated his criminal intent because Stephens could claim a decimal error if challenged by Accenture. However, Accenture did not challenge the $7,800 request. After the original $7,800 success, Stephens began to increase his requests until the final $22,980 request that Accenture uncovered in August 2000.

Stephens testified on his own behalf and stated that he believed that it was appropriate to obtain money via the "add to" function. He argued that he believed that this was an appropriate cash advance and he always intended to repay the money to Accenture at some point in the future. Stephens testified that he believed that cash advances were proper based on information another employee had told him.

The government cross-examined Stephens. It questioned him about alleged dishonest statements made by him on his resume concerning his educational background at Yale University. The government also sought to impeach him with prior acts, including his personal use of car rentals at his last company. The government also obtained concessions from Stephens that he did not obtain prior approval from anyone at Accenture for the alleged cash advances and did not sign a loan document or provide collateral to secure the advances. This allowed the government to argue that common sense dictated that Stephens knew that Accenture did not allow this type of advance to an employee.

The jury returned a guilty verdict on all three counts. Stephens's motion for a judgment of acquittal challenged the sufficiency of the evidence on the issue of whether the government had demonstrated that Stephens had engaged in a fraudulent scheme. More than two months after trial,

and before ruling on the judgment of acquittal motion or sentencing Stephens, the district court issued a *sua sponte* minute order raising the *Batson* issue. The district court stated that the government had used all of its peremptory challenges to strike minority jurors. The court further explained that it had been concerned about the government's exercise of its peremptory challenges during voir dire but assumed that the defendant would object. The district court explained that it concluded at the time that Stephens had a strategic reason for his failure to object.

Nevertheless, after reconsidering its original evaluation of Stephens's failure to object, the district court concluded that there was no valid reason for the defendant's failure. Consequently, the district court stated that it was correcting its prior decision not to question the government during voir dire. The court required the government to provide non-discriminatory explanations for its exercise of its peremptory challenges.

The government responded by arguing that the district court lacked the authority to raise the *Batson* issue *sua sponte* at that stage in the proceedings. The government also provided a variety of non-discriminatory explanations for its challenges. The district court then issued a second minute order agreeing with the government's position that the court did not have authority to raise the *Batson* issue *sua sponte* at that stage in the proceedings and consequently vacated the original order. *United States v. Stephens*, No. 02 CR 661, 2003 WL 21439862 (N.D. Ill. June 20, 2003) (unpublished order). The district court was clear to note that the vacating of its original order did not change its view that a *prima facie* case of a *Batson* violation existed and, consequently, the district court advised Stephens that he should raise the issue in a post-conviction challenge pursuant to 28 U.S.C. § 2255. *Id.* at *5. The court also noted that because it had vacated

its original order, it no longer had the ability to perform steps two and three of the *Batson* analysis.

Stephens then appealed to this court, resulting in our *Stephens I* decision. That decision rejected Stephens's challenge to the sufficiency of the evidence for his wire-fraud convictions. *Stephens I*, 421 F.3d at 507-09. As for the *Batson* issue, the government dropped its objection to Stephens's failure to raise a timely *Batson* claim. Consequently, the *Batson* claim was considered on the merits.

A divided panel held that Stephens had set forth a *prima facie* case of a *Batson* violation pursuant to step one of the three-part *Batson* test. The case was remanded to the district court to conduct additional proceedings pursuant to steps two and three. *Id.* at 518.

On remand, the government provided its non-discriminatory explanations for its peremptory challenges. It also provided its original contemporaneous notes from voir dire to support the proffered explanations. The district court recognized that the government had provided non-discriminatory explanations for its peremptory challenges. These explanations were, however, dismissed as pretextual, and the district court concluded that the government had used its peremptory challenges to eliminate minority jurors in violation of *Batson*. *United States v. Stephens*, No. 02 CR 661, 2006 WL 1663447 (N.D. Ill. June 9, 2006) (unpublished order).

## II. ANALYSIS[1]

The Constitution prohibits the use of peremptory challenges to intentionally discriminate against jurors on

---

[1] A table setting forth characteristics of the jury venire in this case is provided in the attached Appendix.

the basis of protected characteristics such as race, national origin, and gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146 (1994); *Batson*, 476 U.S. at 99. The parties, the jurors, and society as a whole have a right to be free from intentional discrimination in the use of peremptory challenges. "Although a defendant has no right to a 'petit jury composed in whole or in part of persons of [the defendant's] own race,' he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." *Powers v. Ohio*, 499 U.S. 400, 404 (1991) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 305 (1879)). Additionally, "discriminatory use of peremptory challenges harms the excluded jurors and the community at large" because it denies those citizens the opportunity to participate as jurors in the justice system. *Id.* at 406.

Disparate impact is not sufficient to cause the constitutional violation; "discriminatory intent or purpose is required to show a violation." *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977) and *Washington v. Davis*, 426 U.S. 229, 239 (1976)). "Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker selected a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (alterations and quotations omitted); *see also McCleskey v. Kemp*, 481 U.S. 279, 297-99 (1987); *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

We determine whether discriminatory intent influenced the exercise of a peremptory challenge through the three-part *Batson* test. *Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003) ("*Miller-El I*") (citing *Batson*, 476 U.S. at 96-98). The components are: first, the challenging party makes a *prima facie* showing that a peremptory challenge has

been exercised on the basis of an impermissible characteristic such as race, national origin or gender; second, the opposing party offers its non-discriminatory reasons for striking the juror; and third, the trial court determines, based on the parties' submissions, whether the moving party has met his burden of proving purposeful discrimination. *Id.*

" '[T]he ultimate burden of persuasion . . . rests with, and never shifts from, the opponent of the strike.' " *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)). In this case, the burden of persuasion has always rested with the defendant, Stephens.

This court determined the existence of a *prima facie* case pursuant to step one in *Stephens I* and therefore we turn to steps two and three. The second step places an affirmative requirement on the striking party to bring forth a non-discriminatory explanation for its peremptory challenge; a mere denial or assertion that the party has acted in good faith is not sufficient. *Batson*, 476 U.S. at 98. Although the exercise of peremptory challenges is often based on instinct, the exercising party must "state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis." *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) ("*Miller-El II*"). Justifications based on racial or gender stereotypes—such as claiming a juror of a specific race is not suited to serve as a juror or, if selected as a juror, will be more likely to be partial to a party of the same race—do not satisfy the non-discriminatory requirement of step two. *Batson*, 476 U.S. at 97-98.

"The second step . . . does not demand an explanation that is persuasive, or even plausible," but instead the explanation only needs to be non-discriminatory. *Purkett*, 514 U.S. at 767-68. A permissible explanation can appear

foolish, unwise, or even unbelievable, because the only question at stage two is whether the party has provided a non-discriminatory explanation. *Coulter v. McCann*, 484 F.3d 459, 465 (7th Cir. 2007); *see also Miller-El II*, 545 U.S. at 267 (Breyer, J., concurring); *Purkett*, 514 U.S. at 768. Only during *Batson*'s third step does the persuasiveness of the justification become relevant. *Purkett*, 514 U.S. at 768; *Aki-Khuam v. Davis*, 339 F.3d 521, 527 (7th Cir. 2003). "'[T]o say that a trial judge may choose to disbelieve a silly or superstitious reason at step three is quite different from saying that a trial judge must terminate the inquiry at step two when the race-neutral reason is silly or superstitious." *Aki-Khuam*, 339 F.3d at 527 (quoting *Purkett*, 514 U.S. at 768). Terminating at step two because of a silly, race-neutral reason "'violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Id.* (quoting *Purkett*, 514 U.S. at 768).

"The first two *Batson* steps govern the production of evidence . . . . 'It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.'" *Johnson v. California*, 545 U.S. 162, 171 (2005) (quoting *Purkett*, 514 U.S. at 768). "The relevant question during the third step of the *Batson* inquiry is whether a strike was racially motivated. It follows that *Batson* and its progeny direct trial judges to assess the *honesty*—not the accuracy—of a proffered race-neutral explanation." *Lamon v. Boatwright*, 467 F.3d 1097, 1101 (7th Cir. 2006); *see also Purkett*, 514 U.S. at 769; *Hernandez*, 500 U.S. at 365; *United States v. George*, 363 F.3d 666, 674 (7th Cir. 2004).

"The third step requires the court to weigh the evidence and determine whether the [proffered] nondiscriminatory reason for the strike is credible or if the [party op-

posing the strike] has shown purposeful discrimination."
*Coulter*, 484 F.3d at 465. Consequently, the district court
must evaluate the credibility of the race-neutral explana-
tion provided in step two. "Credibility can be measured
by, among other factors, the [offering party's] demeanor; by
how reasonable, or how improbable, the explanations are;
and by whether the proffered rationale has some basis in
accepted trial strategy." *Miller-El I*, 537 U.S. at 339.

In addition, the district court may also consider whether
the justification for the exercise of the peremptory chal-
lenge corresponds to a valid challenge for cause. "While the
reason offered . . . for a peremptory strike need not rise to
the level of a challenge for cause, the fact that it corre-
sponds to a valid for-cause challenge will demonstrate its
race-neutral character." *Hernandez*, 500 U.S. at 362-63
(citing *Batson*, 476 U.S. at 97).

Credibility may also be evaluated by considering the
offering party's consistency in applying its non-discrimina-
tory justification. "'[I]f a [party's] proffered reason for
striking [a prospective juror of one race or gender] applies
just as well to an otherwise-similar [juror of a different
race or gender] who is permitted to serve, that is evidence
tending to prove purposeful discrimination to be consid-
ered at *Batson*'s third step.'" *Coulter*, 484 F.3d at 465
(quoting *Miller-El II*, 545 U.S. at 241). When making
a side-by-side comparison of included and excluded
jurors, the district court should be mindful that "[p]icking
jurors is a complex and multifaceted process. Individual
factors or characteristics often do not provide the 'silver
bullet' that will mean acceptance or rejection of any
potential juror. Rather, it is a combination of factors that
will determine whether a party believes a juror will be
favorable to their side." *Pruitt v. McAdory*, 337 F.3d 921,
930-31 (7th Cir. 2003). The district court should also be
mindful that when making a side-by-side comparison, the
compared jurors do not have to be "exactly identical"

because "potential jurors are not products of a set of cookie cutters." *Miller-El II*, 545 U.S. at 247 n.6.

A further factor that may be considered in determining the credibility of the explanation is whether the non-discriminatory justification offered in step two results in disparate impact on prospective jurors of one race or gender. "'[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another.'" *Hernandez*, 500 U.S. at 363 (quoting *Washington*, 426 U.S. at 242).

Traditionally, we review the district court's finding of intentional discrimination under a deferential standard of review. "'A finding of intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court.*" Batson*, 476 U.S. at 98 n.21 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)); *see also Rice*, 546 U.S. at 338 ("On direct appeal in federal court, the credibility findings a trial court makes in a *Batson* inquiry are reviewed for clear error.") (citing *Hernandez*, 500 U.S. at 364-66); *United States v. Evans*, 192 F.3d 698, 700 (7th Cir. 1999) ("The trial court's determination about the ultimate question of discriminatory intent is a finding of fact, which will be overturned only if clearly erroneous."); *United States v. Roberts*, 163 F.3d 998, 999 (7th Cir. 1998). Under this deferential standard, we will not reverse the district court's decision "simply because we 'would have decided the case differently.'" *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quoting *Anderson*, 470 U.S. at 564), and instead will reverse only "'if, after reviewing the evidence, we are left with a definite and firm conviction that a mistake has been committed,'" *United States v. Mendoza*, 457 F.3d 726, 729 (7th Cir. 2006) (quoting *United States v. Arocho*, 305 F.3d 627, 641 (7th Cir. 2002)). Determining that "two permissi-

ble views of the evidence exist" is not sufficient for a reversal. *United States v. Marty*, 450 F.3d 687, 690 (7th Cir. 2006).

But deference is due only when a district court properly performs its task in the first instance. "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)); *cf. United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006) ("When a judge does not properly calculate a guidelines sentence, our review for reasonableness is forestalled."); *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006). Additionally, we cannot defer to a district court decision that ignores material portions of the record without explanation. "[W]henever a district judge is required to make a discretionary ruling that is subject to appellate review, we have to satisfy ourselves, before we can conclude that the judge did not abuse his discretion, that he exercised his discretion, that is, that he considered the factors relevant to that exercise." *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). Our deference depends on "the district court's account of the facts [being] plausible in light of the record viewed in its entirety." *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 630 (7th Cir. 2001) (citations omitted). When deferring to the district court, "reasonable doubts should be resolved in favor of the district judge's ruling." *Cook v. City of Chicago*, 192 F.3d 693, 697 (7th Cir. 1999). But our exercise of deference requires the district court's "greater immersion in the case." *Id.*

Here, we are unable to defer to the district court's decision finding intentional discrimination by the government. The decision of the district court incorrectly recounts much of the record and fails to note material portions. Because the district court did not factor in material portions of the record, it misapplied the *Batson*

three-part test. As a result of its misapplication of the *Batson* test, no deference is due to the district court's decision finding intentional discrimination. We note that even under a clearly erroneous standard of review, the district court's result would not pass muster. The district court did not perform its task in accordance with *Batson*; it failed to consider the entire record and misapplied the three-part test. In making an error of law, the district court abused its discretion. *Koon*, 518 U.S. at 100.

Facing this situation, we are presented with two options. One option would be to vacate the original decision and remand to the district court with instructions to perform its task in the manner it should have carried out originally. We see no value in ordering another remand for additional proceedings. Viewing the record now in its entirety presents only one plausible conclusion—that there is no *Batson* violation in this case. A second proceeding in the district court would be a redundant exercise. As such, our course is to reverse the district court. *See Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 524 (7th Cir. 1994) ("We have the entire trial record before us and, having reviewed it thoroughly, we confidently conclude that Phillips did not carry its burden, and thus there is no need to remand this case . . ."). As in *Loyd v. Phillips Brothers, Inc.*, we have the entire record before us, and have reviewed it thoroughly. We confidently conclude that Stephens did not carry his burden of persuasion, as required by *Batson*'s third step. Thus, remand would be futile as there is only one plausible conclusion based on the entire record—that there was no *Batson* violation. *See also Pervaiz v. Gonzales*, 405 F.3d 488, 491 (7th Cir. 2005) (stating that remand would be futile if it was clear that petitioner's claim would necessarily fail).

The district court's central error was its failure to take into account the government's non-discriminatory ex-

planations for its peremptory challenges. The district court presented the government's explanation as one in which the government was looking to exclusively excuse potential jurors who lacked white-collar experience and a college education, without a consideration of any other factors.

Although white-collar experience and a college education were important for the government, the record demonstrates that the government never relied on these two factors alone. By the district court's overemphasis of these two characteristics—to the exclusion of other significant points—the court turned white-collar experience and a college education into a simple "litmus test" and ascribed that test to the government, despite the fact that those two factors were not used in that fashion by the government. By transforming a lack of white-collar experience and college education into a "litmus test," the district court was left with a construct in which it would simply find that the "litmus test" was pretextual, and in light of the finding of pretext could easily explain that this new-found pretext was evidence of intentional discrimination.

The district court construed the following argument to support its finding of intentional discrimination. First, the district court noted that the government exercised only five of its seven peremptory challenges—all five excluding minority jurors—but did not challenge white jurors who lacked white-collar experience or a college education. Thus, the district court concluded, if the government was serious about excluding non-white-collar or non-college-educated jurors, it would have, at a minimum, used its other two peremptory challenges to exclude two white jurors who lacked these characteristics.

Second, the district court found the government's explanation pretextual because the government used its peremptory challenge to exclude a minority juror, Juror 10, an Asian American woman who had a college education

and white-collar experience. The district court concluded that Juror 10 met the government's "litmus test" (ascribed to it by the court), and therefore should have been acceptable. In light of these two inconsistencies—failing to strike any white jurors who lacked white-collar experience or a college education, and striking a minority juror who had white-collar experience and a college education—the district court concluded that the government's explanation was pretextual. Seeing pretext, the district court reverted to its original view of this case, that the government had used all of its peremptory challenges to strike minority jurors and had not used a strike against a white juror.

By placing sole emphasis on the white-collar and college-education factors, the district court did not credit the government's strategy in selecting jurors. The government's focus was finding jurors who could understand its case. To prove its case, the government would have to explain accounting and business practices of Accenture—a large international corporation—as well as the operation of the ARTES system, and draw upon traditional workplace practices to make its argument that Stephens had the requisite criminal intent. The government looked to white-collar experience and a college education as two indicators to suggest that the juror could understand the case, but it did not elevate these two factors to the exclusion of all others.

We explicitly recognized in *Stephens I* that the government explained that it was relying on a number of factors in addition to white-collar experience and education including "law enforcement or military experience, criminal history, association with others with law enforcement or military experience or with criminal histories, past litigation experience, and even the presence of spelling or grammar mistakes on the forms the prospective jurors completed." 421 F.3d at 517. In that decision, the

majority specifically refused to consider these "actual" reasons offered by the government during *Stephens I* because the court was reviewing only the limited issue of whether a *prima facie* case existed under step one of the *Batson* test.

Thus, this case was remanded to the district court to give it an opportunity to consider these individualized explanations offered by the government under steps two and three of the *Batson* analysis. Nevertheless, the district court neglected to do this when it ignored all of the individualized explanations provided by the government and instead returned to the sole "litmus test" of white-collar experience and college education. The district court did not perform step three because it did not consider the non-discriminatory explanations and supporting record presented by the government. Instead, the district court reiterated step one of the *Batson* analysis—that the government used its strikes to eliminate minority jurors without an apparent explanation.

But, the government did provide the district court with detailed individualized explanations regarding its strikes of minority jurors. For example, Juror 10, an Asian American woman, had both undergraduate and graduate degrees. She worked for the Chicago Department of Human Services and her division was responsible for providing funds to organizations helping the homeless. The government explained that it exercised a peremptory challenge to strike Juror 10 because "her background and actions during jury selection made her seem potentially hostile to the prosecution [and this] negative attitude outweighed" her education and work experience. The government explained that, "[i]t was the impression of the prosecutors that homeless advocates in general have negative attitudes towards the police because they do not see the police as interested in helping the homeless and because many of the homeless individuals

they serve fear and dislike the police." The government also felt that Juror 10 was likely "politically quite liberal" due to her willingness to help the homeless. "In the view of the prosecutors, individuals with such views often are highly skeptical of the government's exercise of police power, such as through criminal prosecutions, and are more inclined to challenge or question representations made by the government than other individuals." One of the prosecutors claimed to see what he perceived to be negative body language from Juror 10 when another prospective juror was answering a question. This led the prosecutor to conclude that Juror 10 was unfavorable to the government.

Juror 10 fit the court-ascribed "litmus test" by having both a college education and white-collar experience, yet she was clearly unacceptable to the government. But the district court did not consider this individualized explanation. Its overemphasis on white-collar experience and college education led it to conclude that the striking of minority Juror 10 was pretextual—even though it was apparent that the government had a valid, unrebutted non-discriminatory explanation for its peremptory challenge.

The district court did not consider the record and specifically the contemporaneous notes on jury selection provided by the government. If the district court had considered the record it would have seen evidence demonstrating both that the government used individual factors and also that it did not intentionally discriminate. The individual factors utilized by the government to assess the prospective jurors included appropriate positive and negative non-discriminatory factors. For example, with Juror 10, the government's notes included such observations as "lefty," "social," "social work" and "funds homeless delivery system," demonstrating that the government was authentic in its explanation that Juror 10

was unacceptable due to her perceived views. The government's notes substantiate that the government examined a variety of individual, permissible factors related to each juror, a fact that the majority previously recognized in our *Stephens I* decision. Work history and education were two *primary* factors but not the *exclusive* factors. By venturing into the record, we can see that the government exercised its peremptory challenges in a non-discriminatory manner.

The record demonstrates that the district court erred in another of its conclusions. The government pointed out to the court that Juror 4, a Hispanic juror, had been seated and that the government did not use a strike on Juror 13, an African American juror, as evidence that it was not discriminating. In fact, Juror 13 was not seated because she was struck by the defendant. The district court, however, dismissed this argument as "not particularly strong evidence," *Stephens*, 2006 WL 1663447 at *7, and instead returned to its white-collar and college-education "litmus test."

The government's contemporaneous notes confirm most of its assertions. The government gave each juror a grade ranging on an A to F scale, apparently to rank how favorable it believed the perspective jurors were to the government's case. Juror 13, the African American juror who was struck by a defense peremptory challenge, received a grade of "A–" in the government's notes. This is the highest grade given to any juror by the government—the government did not give any A+ or A grades when evaluating jurors—and so Juror 13 was tied at the proverbial top of the government's class with Jurors, 2, 8, 14, 18, and 24. This placed Juror 13 in the top six jurors out of the total 40 jurors in the venire. The defendant used peremptory challenges to strike four of the government's top jurors—Jurors 8, 13, 14 and 18—while Jurors 2 and 24 were seated.

Juror 13 was not only acceptable, she was a first pick for the government. Looking at her background, it is easy to see why. She had an MBA from the University of Chicago and had worked as a product manager and consultant for two cosmetics companies. She also had lived in several places before coming to Chicago, including St. Paul, Minnesota; St. Louis, Missouri; Paris, France; New York, New York; and Bangkok, Thailand. The government made a notation of "urbane" next to the listing of the cities. And unlike Juror 10, who had a college education and white-collar experience coupled with experience unfavorable to the government (working with the homeless), Juror 13 had additional positive characteristics that the government valued. She had a brother who had been a police officer for 12 years and a friend who had recently joined the United States Air Force Judge Advocate General Corps.

Jurors 3, 23, and 33 each received the government's lowest grades of "D." Yet these three lowest-graded jurors were all white men. This further undercuts the district court's general view that the government was trying to load the jury with white jurors and exclude minorities from the jury. The government did not use peremptory challenges on Jurors 3, 23, and 33 because all three were excused for cause.

Juror 3 said that he would have a difficult time being fair and impartial. Juror 23 returned late from a break and responded during in-court voir dire that he had a hard time following presentations or concentrating when information was presented to him. Jurors 3 and 23 fall into the category of lacking white-collar experience and a college education and it appears that the government doubted their abilities to follow the case. It is understandable that the government would place these jurors at the bottom of its list of jurors.

Juror 33 further illustrates these points. Juror 33 was a white male with white-collar experience and a college education, but still received a "D" grade from the government. Juror 33 was a patent attorney but merited a "D" grade because he informed the court that he had plans to leave the country for business in a few days. This was a significant distraction to him and consequently made him an undesirable juror to the government. Although the government did not have to use a peremptory challenge to strike him—Juror 33 was excused for cause—it demonstrates both that the government considered individual factors beyond education and work experience and also that the government was consistent in making non-discriminatory determinations.

Looking at the totality of circumstances also helps to explain why the government struck Jurors 1 and 27. Juror 1 was a 31-year-old single Hispanic woman with no children, from the northwest side of Chicago. Both the government and Stephens used a peremptory strike to exclude her. She had a GED education with some college courses in accounting, and had attended a vocational banking school. She worked as a postal worker for four years. During in-court voir dire, she disclosed that her aunt was a police officer for twelve years in the Chicago Police Department, Narcotics Division. Juror 1 was a victim of a crime—she had a chain stolen from her neck. Her brother, for reasons unknown to her, was under house arrest at a prior time. She also testified on behalf of a defendant in a statutory rape case. The testimony was more than ten years earlier and involved the age of the alleged victim. She said that she could be fair to all sides involved in the case. The government gave Juror 1 a "C–" grade.

The government explained that it struck Juror 1 because she had a blue-collar job, lacked a college degree, and also had various other characteristics that were a concern to the government. The government was concerned with the

fact that she was a postal worker. Government counsel explained that he had interviewed postal workers prior to the Stephens case in relation to another case. He found the postal workers generally hostile to the government. Government counsel also explained that this was consistent with the hostility that other prosecutors had experienced. The government also explained that it was concerned that Juror 1 had appeared as a defense witness in a prior trial.

The government's notes substantiate its explanations. The government circled the answer on Juror 1's jury questionnaire where she listed that she was a postal worker. The government's notation also states that Juror 1 "testified <u>for</u> defendant," supporting the government's statement that it considered this a negative factor. In the end, Juror 1 was struck by both sides.

Juror 27 was a 39-year-old married African-American woman from the south side of Chicago, with one child. She had a diploma in diesel mechanics from the American Diesel Institute and had taken one year of business courses at Chicago State University. She had worked for sixteen years as a bus service supervisor for the Chicago Transit Authority. Juror 27 explained during questioning, "I fix a lot of buses."

The government gave Juror 27 a "B–" and exercised a peremptory challenge to excuse Juror 27. In explaining its peremptory challenge, the government noted that she lacked white-collar experience and a college degree. The government also explained that it was concerned "because her background suggested that she had the potential to hang the jury." The government felt that Juror 27 "was likely to be strong-willed because, as a supervisor of a bus mechanics, she was used to making strong-willed people follow her orders." Being a strong-willed person was a concern to the government because this might

make it more likely that Juror 27 would remain a holdout or try to convince others to join her views should she determine that the defendant was not guilty.

The government's notes also demonstrate how the government differentiated and subdivided the class of jurors who lacked white-collar experience and a college education. The government needed to further subdivide within the group of non-white-collar, non-college-educated jurors, because this category represented a majority of the jurors. For example, the government found Juror 2 acceptable because of her significant connection to law enforcement—she was an office manager at a police union and had several friends in law enforcement. Juror 11 had been in the Army, had mentioned his experience as a utility inspector, discussed a criminal investigation in which he participated while at the utility, and spoke of his nephew who was involved in law enforcement. The government noted that Juror 16 was "blue collar"—he worked for a power company providing power to new homes—and had a high school education. However, Juror 16 received a "B+" grade in part because of his four years in the Marine Corps and cousins who were in law enforcement. Juror 20 received a "B–" grade. Although he worked in a factory and had a high school education, Juror 20 was going back to school for a business degree at the age of 50.

The government also explained that because of the sophisticated nature of ARTES and Accenture's accounting practices, it focused on the jurors' comprehension abilities, as demonstrated in their written and oral responses during voir dire. The government explained that:

> [S]pelling, grammatical, and comprehension errors that the government noted stood out because the jurors did not have the chance to say or write much. The juror questionnaires did not ask for long written

answers, nor did most jurors provide them. Similarly, most of the prospective jurors said little because most of the Court's questions were on paper. Accordingly, if an individual [prospective juror] made repeated and/or glaring mistakes during the voir dire, the government viewed that as compelling evidence of the juror's inability to understand the government's case.

Ability to understand was a key factor in the government's peremptory challenges against Jurors 9, 21 and 36.

Juror 9 was a 39-year-old single Hispanic man from Berwyn, with no children. He worked for five years at a cardboard-box factory, and before that drove a forklift for eleven years. He lived with his retired parents. He received a GED and was attending heating and air-conditioning classes at Morton College. The government noted misspellings on Juror 9's questionnaire. Juror 9's answer to Question 13 ("What are your hobbies and spare time activities?") was: "going to scool for a carrer." The government counsel underlined "HVAC" and also made a notation, "Can he read?" The government gave him a "C" and exercised a peremptory challenge. The government explained that it exercised a peremptory challenge on Juror 9 because his lack of education and white-collar experience, along with his juror questionnaire answers, led the government to conclude that he would likely be unable to understand the government's case.

Juror 21 was a 28-year-old, married Hispanic American man from Franklin Park, with one child. He had a high school education and worked for four years as a "semi-skilled technician" at a car dealership. He had previously worked as a car-accessory installer, and had jobs at a bakery and fast-food restaurant. The district court engaged in the following exchange with Juror 21:

DISTRICT COURT: You answered yes to the question about knowing someone who worked in law enforcement.

JUROR 21: My brother-in-law.

DISTRICT COURT: Your brother-in-law, does he work for a police department.

JUROR 21: No. He is armed service. After 911 he got called in to be security at O'Hare Airport.

DISTRICT COURT: Is he still doing that?

JUROR 21: After the Army, he got out of there, he applied to be a federal agent.

DISTRICT COURT: Is he working there now?

JUROR 21: Not no more. He got called in for—he had to go to Iran.

DISTRICT COURT: So he was with the Army Reserves, and he worked for a time for whatever they call that agency who handles the security at O'Hare, and now his unit has been called up.

JUROR 21: Right.

The government gave Juror 21 a grade of "C." It also made notations of "blue" and "language" in its notes. On remand, the government explained that it challenged Juror 21 because he lacked white-collar experience and a college degree, but also "because he made so many grammatical and comprehension mistakes in the limited time he was questioned during the voir dire that [this] raised doubt about his ability to understand the government's case."

Juror 36 was a 43-year-old, single African American woman from the south side of Chicago, with no children. She had a high school education and worked in home health care. She had previously been a typist for the

Social Security Administration and the Chicago Police
Department. She disclosed that she had a brother who
had been in and out of jail for burglary. The district court
had the following exchange with Juror 36 during in-court
voir dire.

> DISTRICT COURT: What does Attis Health Care do?

> JUROR 36: They employ homemakers and differ-
> ent—to go to patients—sick people and take care of
> them.

> DISTRICT COURT: It is home health care basically?

> JUROR 36: Yes.

> DISTRICT COURT: Got it. And you worked for the
> Chicago Police Department at some point?

> JUROR 36: Years ago.

> DISTRICT COURT: What did you do there?

> JUROR 36. I typed. I typed up the records. Criminal
> arrests I typed.

> DISTRICT COURT: Okay. And so you obviously
> knew a lot of people who worked for the Chicago Police
> Department. Do you have any relatives or close friends
> who are with law enforcement now?

> JUROR 36: Not that I know of.

> DISTRICT COURT: Do you think that you could be
> fair to both sides in considering and weighing the
> testimony of a law enforcement officer?

> JUROR 36: I don't understand the question.

> DISTRICT COURT: If you heard a law enforcement
> officer testify in this case here, do you think that you
> could be fair to both sides in considering that person's
> testimony?

JUROR 36: Yes.

DISTRICT COURT: Do you think that you would tend to give that police officer or law enforcement officer's testimony more weight just because they happen to be a law enforcement officer?

JUROR 36: No.

DISTRICT COURT: You applied for a job with law enforcement. That is obviously the police department. Is there any other job with law enforcement that you have applied for other than your job with the police department?

JUROR 36: No. Maybe the sheriff.

DISTRICT COURT: You may have applied for a job with the sheriff?

JUROR 36: I would like to.

DISTRICT COURT: You would like to. In a similar capacity, the same type of job you had with the police department?

JUROR 36: I would like to be an officer. I would type for the police.

DISTRICT COURT: Have you ever actually applied to be a law enforcement officer? Is that just something you have thought about?

JUROR 36: Something I thought about.

The government gave Juror 36 a "B–." It also wrote "comprehend" and "didn't get the question" in the notes. The government explained that it struck Juror 36 because of her work experience, level of education, and statements made during voir dire. It was also concerned that she had written "health care aid" on the questionnaire. Additionally, the government was troubled with

Juror 36's responses during the in-court voir dire and her brother's criminal history.

As to Jurors 9, 21, and 36, the government was obviously concerned about their ability to comprehend and follow what was going on in the case in light of their in-court voir dire responses. Nevertheless, the district court again dismissed these concerns as pretextual.

The court noted that Juror 11, a white man, had made errors on his questionnaire and had difficulty following in-court voir dire, yet he was not struck by the government. The district court also took the blame for Juror 36's confusion saying that he "threw her a curve ball" follow-up question causing this concern. Nevertheless, the expressed basis for the government's strike of Juror 36 was a valid non-discriminatory reason—the juror's inability to comprehend the questions asked by the judge. That same concern was present with regard to Jurors 9, 21 and 36.

As discussed above, Juror 11 had other factors that the government found favorable including his time in the military and connection to law enforcement. Regardless, the government's explanation for excusing Jurors 9, 21, and 36 was that they had difficulty understanding what was going on in court, a non-discriminatory explanation under step two, and therefore the district court was wrong to dismiss this as pretextual.

When the record is considered in its entirety, it shows that the government exercised its peremptory challenges in a non-discriminatory manner. What remains of the district court's conclusion is merely that it sees a large percentage of minority jurors excluded. This fact, as the majority discussed in *Stephens I*, supports a *prima facie* finding under step one of the *Batson* analysis.

However, when the government provided its explanations under step two, the district court was responsible for considering these explanations along with the record

in total to determine if there was evidence of intentional discrimination. The district court did not complete this task. Instead, it revisited the step one analysis and went no further. The district court was required to apply all three steps of the *Batson* analysis.

This error is understandable on some level due to the tortured path taken by this case. If the *Batson* issue had been addressed *during the in-court voir dire* much of this could have been avoided. The government would have been able to present its explanations and supporting notes immediately, when the record was still fresh in the district court's mind. Unfortunately, the image of a jury composed of all white members, except for one Hispanic member, deliberating on the fate of an African American defendant, appears to have weighed on the district court's perception of discrimination and ultimately overwhelmed any legitimate alternative view.

### III. CONCLUSION

The decision of the district court finding a *Batson* violation and granting the defendant's motion for a new trial is REVERSED; the defendant's convictions are reinstated and AFFIRMED. Because the defendant was sentenced under the then-mandatory sentencing guidelines, we now order a LIMITED REMAND pursuant to our decision in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), so that the district judge can communicate to us whether he would have imposed the same sentence on the defendant had he known that the sentencing guidelines were advisory instead of mandatory.

ROVNER, *Circuit Judge*, dissenting. The district court in this case properly analyzed the *Batson* issue, and the majority's treatment of that district court opinion is so dismissive of the district court that I must write separately to express my disagreement. The majority is only able to reverse the district court by: (1) declaring that the district court was so unaware of the record before it that deference to its decision is no longer due; and (2) usurping the role of the district court by refusing to remand the case and instead deciding the issue for ourselves. There is no basis for either conclusion. The majority opinion mischaracterizes the district court opinion in concluding that the district court failed to consider all of the factors, and the opinion as a whole evidences a disregard for the district court's analysis and its role. Accordingly, I dissent.

The majority recognizes that it is the role of the district court at step three of the *Batson* inquiry to evaluate the credibility of the race-neutral explanation and that the role is so significant that we will not overturn those findings unless they are clearly erroneous. *Rice v. Collins*, 546 U.S. 333, 338 (2006). The majority end-runs that deferential review by stating that the district court opinion incorrectly recounted much of the record, failed to note material portions, and applied a "litmus test" to the *Batson* issue which exclusively focused on the factors of white collar experience and college education. Majority Op. at 14-15. By holding that the district court did not factor in material portions of the record, the majority concludes that the district court is owed no deference in its application of *Batson*. The majority then goes one step further, and declines to remand the case to allow the district court to consider the record in its entirety, instead concluding that the record presents only one plausible conclusion, which is that no *Batson* violation is present.

It is true that the district court focused predominantly on two factors—work experience and ability to understand

the case—in evaluating whether the race-neutral explanations were pretextual. That focus was appropriate because the government quite clearly identified those factors as the primary reasons for its challenges. Indeed, the government in the district court devoted the first 12 pages of its Government's Statement of Reasons (hereinafter "Govt. Reasons") to explaining why classifications based on work experience and ability to understand the case are race-neutral and are proper factors for exercising the peremptory challenges. It is not until later in its argument that the government even explored other related factors. In fact, the government in its arguments to the district court repeatedly identified those two factors as predominant, beginning with a section entitled "The Government's General Approach to Striking Jurors," in which the government stated:

> there were two factors that the government considered to be particularly significant in this case: (1) the juror's work experience; and (2) the juror's ability to understand the government's case. As a general rule, the government struck prospective jurors who lacked white collar work experience and who demonstrated the least ability to comprehend the government's case. The importance of those two factors to the government reflected the nature of the case . . .

Govt. Reasons at 2-3. The critical importance of those factors was then developed at length, and repeatedly emphasized. In fact, the government declared that "virtually all of the government's strikes are readily explained by the jurors' work experience and ability to understand the case." Government's Reply to Defendant's Response to Government's Statement of Reasons (hereinafter "Govt's Reply) at 12. Regarding the second factor—the ability to understand the case—the government explicitly tied that to the level of education, declaring: "The government assumed that people with college degrees would be

more likely to understand all the nuance of the government's case than people who had less education. Accordingly, as a general rule, the government looked to strike individuals who lacked a college degree." Govt. Reasons at 7.

The district court accurately characterized the government's arguments. The court noted that the government considered to be "particularly significant" the factors of work experience and the juror's ability to understand the government's case. The court in fact quoted the government's own rationale for use of its peremptories and its explanation of those two factors. Regarding the jurors' ability to understand the case, the court quoted the above language concerning the relevance of a college education, and also noted the significant weight the government placed on mistakes jurors made in written and oral responses during voir dire as illuminating the potential jurors' ability to understand the case. The district court properly determined that those reasons provided by the government were race-neutral, but concluded that those factors were not what actually motivated its peremptory challenges.

Thus, the district court appropriately focused on the factors identified by the government as those driving its peremptory challenges. The majority's characterization of that as a "litmus test" that blinded the district court to any other explanations is simply inaccurate. It is disingenuous to fault the district court for focusing on those factors when it was the government that argued to the district court that "virtually all of the government's strikes are readily explained by the jurors' work experience and ability to understand the case." Govt's Reply at 12. The district court simply quoted the government's own rationale. Nor was the district court unaware of the other factors considered. The district court recognized the government's argument that among those unacceptable

jurors lacking college education and white collar experience, the government looked to other factors to decide which jurors were the least desirable. That is because the government did not have enough peremptory challenges to eliminate all of the jurors in that undesirable pool. *See* Govt.'s Reply at 7 ("as 17 jurors lacked a college degree and 9 jurors had no white collar experience, it would have been impossible for the government to strike all the jurors in either category with its 7 peremptory challenges. As a result, the government had to consider additional factors among the jurors who lacked a college degree and/or white collar experience to determine its strikes.")

Contrary to the majority's characterization, the district court in fact acknowledged that the government had identified those other factors as a means to rank the potential jurors in that undesirable pool, ostensibly so that the government could eliminate the least desirable among them. In other words, the work experience and ability to understand were the primary factors in determining a pool of potential jurors who would all be undesirable to the government. In choosing how to allocate the limited number of peremptory challenges among those undesirable jurors, the government argued that it looked to secondary factors. But the court held that those other factors were ultimately irrelevant, because the numbers made it clear that the government was not doing what it said. The government was not credible in stating that it tried to eliminate the potential jurors who lacked the ability to understand the case and white collar experience. There were eleven jurors who both lacked white collar work experience and either lacked a college degree or allegedly showed confusion on the written and oral voir dire, six of whom were Caucasian and five of whom were African-American or Hispanic-American. The government eliminated only five of them, despite having seven peremptory challenges available to it. If, as it

claimed, the government exercised its challenges so as to remove as many potential jurors as possible who lacked white collar experience and the ability to understand the case, then it would have eliminated seven within that group. No claim is made that strategy or other factors required it to retain some peremptory challenges. Nor was the government credible in stating that it looked to other factors to rank the jurors within that group so as to best allocate its challenges among those undesirable potential jurors. If it had, then the bottom seven would have been eliminated. Instead, only five challenges were made to that group that the government had already identified as undesirable, and all five were against minority jurors, eliminating every minority within that group. The government—despite identifying white collar experience and college education as the most significant factors—did not exercise peremptory challenges against a single one of the six Caucasian prospective jurors who both lacked white collar experience and exhibited an inability to understand the case. Instead, it used one of the two remaining peremptories on an Asian-American potential juror who possessed both white collar experience and a college education, and it left its remaining peremptory challenge unused, allowing on the jury the potential Caucasian jurors who lacked both the white collar experience and the ability to understand the case that the government had deemed so critical.

Far from being unaware of the government's arguments regarding the other factors, the district court was aware of them, but stated that they were irrelevant because the government could not explain why it had failed to use the remaining peremptory on any Caucasian member of that undesirable potential juror group. It was not clearly erroneous for the district court to determine that if those factors were so critical as to explain "virtually all of the government's strikes," it would have at least

exercised its unused peremptory challenges against one
of the white jurors who lacked white collar experience
and the ability to understand the case, instead of eliminat-
ing only the minority jurors so situated and leaving the
peremptory challenge unused. Thus, there is absolutely
no evidence that the court was unaware of, or failed to
consider, the record as a whole, or the government's
arguments as a whole. In fact, the district court explicitly
acknowledged those other factors. The majority clearly
would have not reached the same conclusion, but such a
difference of opinion is not a basis for reversal. *Easley v.
Cromartie*, 532 U.S. 234, 242 (2001); *Anderson v. Bessemer
City*, 470 U.S. 564, 573 (1985). Where, as here, the dis-
trict court properly considered the record and the law as
a whole, the district court's decision must be affirmed
unless clearly erroneous. The majority cannot avoid that
standard by mischaracterizing the district court's opinion
and impugning the court. Because the district court
properly identified the government's arguments and
addressed them in light of the applicable law, it is en-
titled to deference and should be affirmed.

In fact, even under its non-deferential review, there is
no support for the majority's determination that the rec-
ord yields only one plausible conclusion in the *Batson*
challenge. The extensive, subjective weighing of factors,
and the conclusion regarding which are important and
which are not, that constitutes the bulk of the majority
opinion, itself reveals the fallacy of any such argument
of inevitability. The majority attempts to lend an aura of
objectivity to the process by premising the challenges on
the allegedly race-neutral grading system used by the
prosecutor, in which some potential minority jurors
received high grades and some potential white jurors
received low grades. The majority provides a chart in the
Appendix that sets forth those grades to purportedly
demonstrate that the government's strikes were based on
its race-neutral grading system.

A glance at that chart belies any such easy conclusion. Even assuming, as the majority does, that the grading was done in a race-neutral manner, the chart reveals that the government allowed no one on the jury who scored below a B-, and did not challenge anyone who scored a B or above. For those that scored a B-, however, the result was anything but race-neutral. Five jurors received a rating of B-, three of whom were white and two of whom were African-American. One of those white jurors was excused for cause. Of the potential jurors remaining who had a B- grade, the two white candidates were seated as jurors, and the two African-American candidates were dismissed as a result of government peremptory challenges. That is hardly evidence of racially-neutral use of peremptory challenges. Nor did the government have to make such a choice at all. As the district court points out, the government retained an unused peremptory challenge, and thus could have excluded at least one of the remaining jurors graded B-, yet it chose to challenge only the minority jurors with that grade. Tellingly, all of those prospective jurors rated B- lacked both white collar experience and a college degree (although one white prospective juror was attending college), and the government nevertheless exercised its peremptories to exclude the minority candidates, but allowed the white prospective jurors to serve despite retaining an unused peremptory challenge. Although the majority attempts to neutralize that determination with the listing of purported positive and negative factors for the government, the grade itself presumably reflects the government's own weighing of those factors. It remains that among those rated a B-, the available white candidates were allowed to serve and the government used peremptory challenges to eliminate both African-American candidates.

Thus, even using the purportedly neutral grading system that the majority identifies, it does not indicate race-

neutrality, and certainly does not establish it to such a degree that we could state that the record presents only one plausible conclusion. The case at a minimum should have been remanded to the district court if the majority believed that the court did not apply the proper legal standard, because the convoluted facts of this case do not lend themselves to a decision by an appellate court of the *Batson* issue as a matter of law. The district court—and more importantly, the defendant— deserved better than that, however, as the district court properly analyzed the record before it. Applying the proper standard of deferential review, the decision of the district court should have been affirmed outright. For that reason, I dissent.

**APPENDIX**

| Juror Number | Race | Gender | Grade Given by Govt | College Degree | White-Collar Work | Individualized Positive Factors for Government | Individualized Negative Factors for Government | Resolution |
|---|---|---|---|---|---|---|---|---|
| 1 | Hispanic | Female | C– | No | No | | - testified for defendant in rape case<br>- brother on home arrest<br>- postal worker; government concerned about hostility toward prosecution | Government and Defendant Peremptory |
| 2 | White | Female | A– | No | Yes | - significant connection with law enforcement<br>- office manager at a police union | | Seated as Juror |
| 3 | White | Male | D | No | No | | - said he would have a difficult time being fair and impartial | Excused for Cause |
| 4 | Hispanic | Female | B | No | Yes | - associate's degree in accounting; white-collar experience | | Seated as Juror |
| 5 | White | Male | B+ | No | Yes | - white-collar experience as a bookkeeper and clerk | | Seated as Juror |
| 6 | White | Female | B | Yes | Yes | - white-collar experience; administrator at a residential house for disabled adults | | Seated as Juror |
| 7 | White | Female | B | No | Yes | - white-collar work as an account-manager assistant | | Seated as Juror |
| 8 | White | Female | A– | No | Yes | - white-collar experience; 14 years as an executive assistant for a bank; additional administrative work | | Defendant Peremptory |
| 9 | Hispanic | Male | C | No | No | | - many misspellings on questionnaire: "going to scool for a carrer"<br>- government questioned if juror could read | Government Peremptory |
| 10 | Asian | Female | C– | Yes | Yes | | - social worker working with homeless: "lefty"<br>- government felt she may hold negative attitudes about law enforcement<br>- government interpreted facial reaction during jury selection as hostile | Government Peremptory |

| Juror Number | Race | Gender | Grade Given by Govt | College Degree | White-Collar Work | Individualized Positive Factors for Government | Individualized Negative Factors for Government | Resolution |
|---|---|---|---|---|---|---|---|---|
| 11 | White | Male | B+ | No | No | - worked as utility investigator in fraud case<br>- Army experience<br>- positive impression of law enforcement; relatives in law enforcement | | Defendant Peremptory |
| 12 | White | Male | B | No | No | - two relatives in law enforcement | | Seated as Juror |
| 13 | Black | Female | A– | Yes | Yes | - lived in many large cities before Chicago; "urbane"<br>- had an MBA; worked as a product manager<br>- brother had been a police officer and was now an Air Force JAG | | Defendant Peremptory |
| 14 | White | Female | A– | Yes | Yes | - sales/account executive<br>- government felt that juror was judgmental toward her brother for his criminal conduct | | Defendant Peremptory |
| 15 | White | Male | B+ | No | No | - putting himself through college<br>- military experience; serving, at the time of trial, in the Army National Guard<br>- "open" about uncle's criminal experiences | | Seated as Juror |
| 16 | White | Male | B+ | No | No | - ex-Marine<br>- cousins in law enforcement; applied for law-enforcement jobs | | Seated as Juror |
| 17 | White | Female | B | Yes | Yes | - high school teacher | | Defendant Peremptory |
| 18 | White | Female | A– | Yes | Yes | - loss-control consultant | | Defendant Peremptory |
| 19 | White | Female | B+ | No | Yes | - real-estate appraiser | | Excused for Cause |
| 20 | White | Male | B- | No | No | - attending college at the time of trial, at the age of 50, after lifetime of blue-collar work (would likely be unsympathetic to Stephens's lies about his Yale degree) | | Seated as Juror |

| Juror Number | Race | Gender | Grade Given by Govt | College Degree | White-Collar Work | Individualized Positive Factors for Government | Individualized Negative Factors for Government | Resolution |
|---|---|---|---|---|---|---|---|---|
| 21 | Hispanic | Male | C | No | No | | - made numerous grammatical and comprehension mistakes when questioned by court | Government Peremptory |
| 22 | White | Male | B+ | Yes | Yes | - white-collar work in pharmaceutical sales | | Defendant Peremptory |
| 23 | White | Male | D | No | No | | - had a hard time following things and concentrating | Excused for Cause |
| 24 | White | Male | A– | Yes | Yes | - white-collar work as a sales director | | Seated as Juror |
| 25 | White | Male | B+ | No | No | - had worked in law enforcement; relatives in law enforcement and judiciary | | Excused for Cause |
| 26 | White | Male | B– | No | No | - sister a police officer<br>- said "unfortunately, no" when asked if anyone was arrested for stealing his trucks | | Seated as Juror |
| 27 | Black | Female | B– | No | No | | - government felt she had the potential to hang a jury because of her 23 years of experience as a CTA bus mechanic supervisor; worried she would be "strong-willed" | Government Peremptory |
| 28 | White | Male | B+ | Yes | Yes | - account executive; had previously worked as an auditor | | Defendant Peremptory |
| 29 | White | Female | B | Yes | Yes | - white-collar experience as office manager at graphic artist consulting firm | | Seated as Juror |
| 30 | White | Female | B– | No | Yes | - white-collar work as shipping/receiving clerk | - was not sure she could be fair | Excused for Cause |
| 31 | White | Male | B+ | Yes | Yes | - six years in military<br>- close friend of 25 years was a police officer<br>- dismissive of son's work as public defender for "bizarre clients"<br>- absolved police for role in a civil suit for malicious prosecution | | Defendant Peremptory |

| Juror Number | Race | Gender | Grade Given by Govt | College Degree | White-Collar Work | Individualized Positive Factors for Government | Individualized Negative Factors for Government | Resolution |
|---|---|---|---|---|---|---|---|---|
| 32 | White | Male | B | Yes | Yes | - Army experience<br>- teacher | | Alternate Juror |
| 33 | White | Male | D | Yes | Yes | - patent attorney | - planned to leave the country in a few days and was distracted | Excused for Cause |
| 34 | Black | Male | B | Yes | Yes | | - was not sure he could be impartial | Excused for Cause |
| 35 | White | Female | B | No | Yes | - worked as a hospital admitting representative for 25 years | | Alternate Juror |
| 36 | Black | Female | B– | No | No | | - had difficulty following court's simple questioning during voir dire; did not seem to understand; was confused<br>- had a brother who had been in and out of jail for breaking into houses | Government Peremptory |
| 37 | White | Male | B+ | No | Yes | - had previously worked as a fire inspector, building inspector, and police officer | - presented impartiality concerns | Excused for Cause |
| 38 | White | Female | B+ | Yes | Yes | - white-collar experience as Vice President of Sales | - reported that it would be very difficult to be fair | Excused for Cause |
| 39 | White | Male | B+ | Yes | Yes | - computer scientist; part-time community college teacher | | Defendant Peremptory |
| 40 | White | Female | B | Yes | Yes | - social worker at a middle school; government not concerned about a particular ideology associated with this type of social work | | Excused |

<u>Note:</u>
The district court first considered challenges for causes. After determining the jurors that would be excused for cause, the district court gave each side 15 minutes to consider their peremptory challenges. The government was given seven peremptory challenges and the defendant was given eleven peremptory challenges. Both sides provided their peremptory challenges on a written piece of paper submitted to the district court. The district court noted that both sides exercised a peremptory challenge on Juror 1 and that the government had failed to exercise all of its challenges. Consequently, the district court asked the government if it wanted to exercise another challenge. The government selected Juror 21. Juror 40 was excused because the court had already seated a full complement of 12 jurors and two alternates.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*